UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| United States of America,<br><br>Petitioner,<br><br>v.<br><br>Delaware Department of Labor,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)  Misc. No. 25-mc-322-CFC<br>)<br>)<br>)<br>)<br>)<br>) |

**RESPONDENT DELAWARE DEPARTMENT OF LABOR'S
MOTION TO UNSEAL EXHIBIT AND TO STAY PROCEEDINGS**

Respondent Delaware Department of Labor (the "DDOL"), by and through its undersigned counsel, hereby respectfully requests that this Court unseal Exhibit B to the United States of America's Petition to Enforce Department of Homeland Security Administrative Subpoena (D.I. 2 hereinafter, the "Petition"). Further, the DDOL moves to stay any hearing on the Petition to permit time to notify the businesses identified in Exhibit B, and allow them to retain counsel and intervene if desired.  In support of its motion, the DDOL states as follows:

**FACTUAL BACKGROUND**

1.  According to Petitioner United States of America ("Petitioner"), in February of 2025, Department of Homeland Security ("DHS") through Homeland Security Investigations ("HSI") and U.S. Immigrations and Customs Enforcement

("ICE") began investigating tipline reports that various Delaware businesses are employing undocumented immigrants. (D.I. 2, Ex. A ¶ 6.)

2. In February of 2025, the DDOL Division of Unemployment Insurance ("DDOL/UI") began receiving—via email—a series of administrative subpoenas from DHS seeking wage reports for certain target businesses in Delaware. Each successive subpoena differed from those that came before, with a final, superseding subpoena, identified as DHS Immigration Enforcement Subpoena Number HSI-WM-2025-048065-001 (the "Administrative Subpoena"), being sent in April of 2025. (*See* Exhibit A, Declaration of Secretary LaKresha Moultrie ¶ 29 (hereinafter "Ex. A, Moultrie Decl.").

3. It is the Administrative Subpoena, only, which is the subject of this action. Petitioner has not moved under, or sought an order to seal, any of the preceding subpoenas issued in February and March 2025.

4. The many iterations of DHS's subpoenas were plagued with issues. Among the concerns is the fact that the names and addresses of the businesses did not match DDOL/UI's records, and Petitioner did not provide FEINs for the businesses about which confidential data was being sought, except for one. (*Id.* at ¶ 29, 32-33, 35).

5. Throughout this multi-month process, DHS *never* communicated to DDOL/UI or anyone else within the State of Delaware that any of the subpoenas

were required to be kept confidential. (*Id.* at ¶30.) Nor did DHS take any measures to protect the purported confidentiality of the subpoenas. "Nonetheless, based upon a request at the bottom of each subpoena, and in good faith, DDOL/UI did not disclose the existence of the subpoenas to the target businesses." *Id*.

6. On July 31, 2025, Petitioner filed the instant action, seeking an order to show cause as to why the Administrative Subpoena should not be enforced. Petitioner also filed a Motion to Seal Exhibit B (the Administrative Subpoena) to the Petition, arguing that the Administrative Subpoena should be kept under seal "[s]o as not to prematurely alert the targets of SI's worksite investigations as to the investigations' existence[.]" (D.I. 1.) The Court granted the Motion to Seal on August 1, 2025, and set a Show Cause Hearing for August 6, 2025. (D.I. 7.)

## **LEGAL STANDARD**

7. As this Court has made clear, "[t]he District Court is not a star chamber. We are a public institution in a democratic republic and the public has a right of access to our filings and proceedings." *WSOU Investments, LLC v. Salesforce, Inc.*, 2023 WL 2213200, at *2 (D. Del. Feb. 24, 2023). To that end, courts in the Third Circuit may unseal any previously sealed records pursuant to the Court's general discretionary powers. *See United States v. Wecht*, 484 F.3d 194, 211 (3d Cir. 2007), *as amended* (July 2, 2007); *see also Sonrai Memory Ltd. v. Hewlett Packard Enter. Dev. LP*, 2023 WL 3121924, at *1 (D. Del. Mar. 31, 2023).

3

8. These broad discretionary powers align with the public's broad right to access judicial documents. This right is well-established and uncontroversial. "It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978); *see also In re Avandia Mktg., Sales Practices & Products Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (". . . the common law presumes that the public has a right of access to judicial materials."). This general right has been described by the Third Circuit as "pervasive" and "beyond dispute". *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 161 (3d Cir. 1993) (citation modified)). Indeed, the public's right to access judicial documents even "'antedates the Constitution.'" *Avandia*, 924 F.3d at 672 (quoting *Bank of Am. Nat. Tr. & Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 800 F.2d 339, 343 (3d Cir. 1986)).

9. Thus, when a document qualifies as a judicial document, the public's right to access the information is presumed. *See id.* Judicial records are documents "that 'ha[ve] been filed with the court . . . or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings.'" *Id.* (quoting *In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001)).

10. Overcoming this presumption requires a "showing 'that the interest in secrecy outweighs the presumption'" in favor of public access and "'that the material

is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure.'" *Id.* (internal citations omitted). Accordingly, a party seeking continued confidentiality "must make a 'particularized showing of the need for continued secrecy' if the documents are to remain under seal." *Leucadia*, 998 F.2d at 166 (citation omitted).

## ARGUMENT

### I. The Administrative Subpoena Should Be Unsealed

11. Any interests Petitioner claims to have in sealing the Administrative Subpoena cannot overcome this Court's preference for, and the well-settled presumption in favor of, public access to judicial documents. Indeed, the context surrounding the Administrative Subpoena's issuance makes plain that confidential treatment is neither required nor appropriate under the circumstances.

12. The Administrative Subpoena has never been confidential. The statute granting DHS subpoena power (and its implementing regulations) contain no provision granting DHS the authority to impose confidentiality obligations upon subpoena recipients. 8 U.S.C. § 1225(d)(4)(A). Nor do they provide a mechanism for enforcement of the nondisclosure language present on the face of administrative subpoenas. *Id.* In sum, other than a general, unenforceable nondisclosure request contained in the Administrative Subpoena itself, the Administrative Subpoena—in any of its iterations—was *never* confidential prior to this Court's August 1, 2025,

5

Order. (*See* Aug. 6, 2025 Show Cause Hearing Tr. at 18:12-19 [hereinafter Tr. at]; D.I. 1; D.I. 11).

13. Moreover, DHS failed to take any enforceable measures to protect the supposed confidentiality of the information contained in the subpoenas. DDOL/UI is aware of no attempt by DHS to seek a confidentiality order from this Court when it issued any of the five administrative subpoenas that preceded the superseding Administrative Subpoena that is the subject of the Petition.

14. Rather, as HSI Special Agent Kimberly Caraway ("Agent Caraway") admitted in her Declaration, she merely corresponded with an administrative assistant at the DDOL/UI via email or phone. (D.I. 2, Ex. A., Caraway Decl. ¶¶ 14–19.).

15. At no point throughout the nonconfidential back-and-forth between Agent Caraway and the DDOL administrative assistant was the administrative assistant told she must keep the communications or any information related to the subpoenas confidential. Nor did the administrative assistant indicate that she, or anyone she was working with at the DDOL or otherwise, was taking any steps to maintain the subpoenas as confidential. *See, e.g.*, D.I. 2, Caraway Decl. ¶¶ 16, 18; Moultrie Dec. ¶¶ 30, 37-48).

16. Indeed, nothing precluded the DDOL—via statute, court order, or otherwise—from alerting the media or some other third-party about the contents of

6

the Administrative Subpoena. (*See* Tr. at 7:3–8:7); *see also Doe v. Ashcroft*, 334 F. Supp. 2d 471, 485 (S.D.N.Y. 2004), *vacated as moot sub nom. Doe v. Gonzales*, 449 F.3d 415 (2d Cir. 2006) ("most administrative subpoena laws either contain no provision requiring secrecy, or allow for only limited secrecy in special cases").

17. If DHS felt the information contained in the Administrative Subpoena was sufficiently confidential to warrant sealing in this action, it should have maintained that position during the several months it communicated with DDOL/UI about the subpoenas. DHS's telling lack of concern for confidentiality prior to July 2025 undercuts its claim to this Court that confidentiality is required, and casts doubt on the assertion that any "clearly defined and serious injury" exists should the Administrative Subpoena be unsealed.

18. Further, there is a particular public interest at stake where, as here, the party seeking to seal otherwise public judicial documents is a government actor. The United States Supreme Court has noted that a "citizen's desire to keep a watchful eye on the workings of public agencies" is sufficient justification to support public access to such records. *See Nixon*, 435 U.S. at 597. And "[t]he appropriateness of making court files accessible is accentuated in cases where the government is a party: in such circumstances, the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch." *F.T.C. v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987).

19.     The interest in maintaining watch over the government's investigative activities is particularly persuasive where, as here, Agent Caraway states the subpoenas are being issued based upon on nothing more than uncorroborated, anonymous reports submitted to a tipline. (D.I. 2, Ex. A, Caraway Decl. ¶¶ 5-7.) *See*, *e.g.*, *Alabama v. White*, 496 U.S. 325, 329 (1990); *Adams v. Williams*, 407 U.S. 143 (1972); *United States v. Torres*, 534 F.3d 207 (3d Cir. 2008). Rather, DHS' rapid issuance of three preceding subpoenas over a series of five weeks, seeking the wage reports of twenty distinct businesses, (Ex. A, Moultrie Decl. ¶¶ 29(a-c)), strongly suggests DHS' administrative subpoena policy and practice is tantamount to a constitutionally prohibited "roving patrol." *See*, *Perdomo v. Noem*, 2005 WL 2181709 (9th Cir., August 1, 2025) (upholding a TRO prohibiting immigration officials from conducting investigative detentions that were alone, *or in combination*, based solely on race/ethnicity; speaking Spanish or speaking English with an accent; presence at a particular location; and the type of work one does).

20.     Against this backdrop, Petitioner cannot meet its burden to justify continued sealing of the Administrative Subpoena. The Petitioner's generalized reasoning for seeking confidential treatment of the Administrative Subpoena—so the target businesses are not alerted to HSI's investigations—coupled with DHS's past conduct relating to the issuance of the Administrative Subpoena, contradicts any need for judicially enforced secrecy.

21. The countervailing and well-established interest in public access to documents like the Administrative Subpoena must prevail. In addition to protecting the threshold right of public access, granting the Motion would permit the targets of the Administrative Subpoena to advocate for their own interests in protecting their confidential data, which may differ from those of the Department of Labor. For example, the targets of the Administrative Subpoena are entitled, if they believe it necessary, to move to intervene in this action and seek protection from the dissemination of their confidential information and/or protection from DHS' unconstitutional practices of immigration enforcement that have the potential to abuse this court's power to enforce administrative subpoenas. *See*, *EEOC v. Farmer's Pride, Inc.*, 2014 WL 1053482, at *4 (E.D. Pa. 2014) (court recognized both the recipient and target of an administrative subpoena have standing to dispute it); *Hell's Angels Motorcycle Corp. v. Cnty. of Monterey*, 89 F. Supp. 2d 1144, 1149-1153 (N.D. Cal. 2000) (recognizing that holders of a privacy interest must have a reasonable pre-enforcement opportunity to object to the enforcement of an administrative subpoena).

22. Furthermore, unsealing the Administrative Subpoena furthers the compelling public policy of encouraging a stable workplace and workforce, workplace justice and a strong economy. (Ex. A, Moultrie Decl. ¶¶ 3). The unemployment insurance system relies upon businesses registering with the State,

accurately disclosing the composition of their workforce and the wages being paid to employees, and properly remitting taxes to the trust fund that pays out unemployment benefits to those who find themselves unemployed through no fault of their own. (*Id*. at 6-8). The State does not have the resources to aggressively seek out and prosecute businesses that do not comply with state unemployment law reporting requirements. (*Id*. at 10). Instead, these issues are frequently identified when a business applies for grants, State contracts, or seeks to wind down business in the State. On a national and local level, ICE is routinely raiding businesses in certain industries as part of its mandate to zealously enforce immigration law by meeting daily arrest quotas.[1] The fear instilled by secretive collection of business

---

[1] Marianne LeVine, et al., *ICE is Arresting Migrants in Worksite Raids. Employers are Largely Escaping Charges*, The Washington Post (June 30, 2025), https://www.washingtonpost.com/immigration/2025/06/30/ice-raids-arrests-workers-companies/ (noting an April announcement by ICE officials that the agency had arrested more than 1,000 workers during Trump's first 100 days and collecting stories of workplace raids across the country); Mark Moran, *ICE Detains More than 530 People in Workplace 'Raids' in U.S. Northeast*, United Press International (Jan. 23, 2025), https://www.upi.com/TopNews/US/2025/01/23/ice-details-538-ion-workplace-raids/7811737692376/. ICE raids were conducted in Sussex County, Delaware in March 2025, which were reported locally by media as causing disruption and a refusal by some trade workers to drive work vans to job sites Jose Ignacio Castaneda Perez, *'Incredibly Dystopian': ICE Enforcement Upends Lives for Rural Delaware Communities*, Delaware Online/The News Journal (August 8, 2025), https://www.delawareonline.com/story/news/local/2025/08/08/rural-delaware-communities-upended-by-inrice-enforcement-upends-lives-for-rural-delaware-communities/85557370007/ (reporting on DHS' Delaware immigration enforcement efforts in March, 2025).

data injects a level of uncertainty into the system that fundamentally undermines the stability of the unemployment process and will jeopardize the financial health of the trust that funds these benefits. (Ex. A, Moultrie Decl. ¶¶ 49-51, 53-55).

## II **Resolution of the Petition Should Be Stayed Pending Notification to the Target Businesses and an Opportunity for the Target Businesses to Retain Counsel and Intervene**

23. In light of the foregoing, the Respondent requests that the Court enter an order unsealing the Administrative Subpoena, and staying this action for a reasonable period of time to allow the Respondent to notify the targeted businesses of the Administrative Subpoena, and permit those businesses time to engage legal counsel and move to intervene in this action if they so desire. *Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1077 (3d Cir. 1983) ("The power to stay proceedings is incidental to the power inherent in every court to schedule disposition of the cases on its docket so as to promote fair and efficient adjudication. How this can best be done is a decision properly vested in the trial courts.").

24. The Delaware businesses identified in the Administrative Subpoena have interests in their wage reports that are distinct and independent from those interests being asserted by the DDOL, above. More specifically, Delaware businesses have an interest in protecting their data that is deemed confidential by federal and state law and regulations, 42 U.S.C. §503(a)(1); 20 C.F.R. §603.4(b) & (j); 19 *Del. C.* § 3125(a)(1); 19 *Del. Admin. C.* § 1201 (12.5), and have an interest in

protecting their workforce and a stable labor market. Media reports are rife with concerns of U.S. citizens and legal immigrants being questioned and, in some cases, detained despite the presentation of valid identification. In these circumstances, the secretive collection of data to facilitate raids based upon anonymous, unverified tips, is likely to result in a destabilization of the labor market, where individuals who are being targeted because of their appearance, accent, or the industry in which they work are hesitant to apply and appear for work that they are lawfully authorized to do, for fear of being caught up on a dragnet and wrongfully detained.

25. Accordingly, it is imperative that the Court unseal what was once in the public domain to allow the targeted businesses to assert their own objections if they so desire. *See*, *e.g.*, *Nat'l Labor Relations Bd. v. PNC Bank, N.A.*, 2021 WL 6502553, at *6 (D. Conn. July 23, 2021) (granting motion to intervene where "[t]he Intervenors claim an interest . . . because the NLRB seeks to enforce a subpoena that would require PNC to produce the Intervenors' financial documents, which the Intervenors assert are confidential."); *Oregon Prescription Drug Monitoring Program v. United States Drug Enf't Admin.*, 2013 WL 12325112, at *3 (D. Or. Mar. 31, 2013). Indeed, the businesses being targeted are not even aware of the need to seek counsel because their involvement is being shielded from public view.

## CONCLUSION

26.     For the reasons set forth above, and consistent with this Court's strong public interest in access to information, the Respondent respectfully requests that the Court grant its Motion to Unseal and Stay in the form attached hereto.

Respectfully submitted,

**DELAWARE DEPARTMENT OF JUSTICE**

*/s/ Jennifer Kate Aaronson*
Jennifer Kate Aaronson (DE Bar No. 3478)
Ian R. Liston (DE Bar No. 5507)
820 N. French Street
Wilmington, DE 19801
(302) 683-8800
jennifer.aaronson@delaware.gov
ian.liston@delaware.gov

*Counsel for Delaware Department of Labor*