# Exhibit A

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| United States of America, ) | |
| ) | |
| Petitioner, ) | |
| ) | Misc. No. 25-mc-322-CFC |
| v. ) | |
| ) | |
| Delaware Department of Labor, ) | |
| ) | |
| Respondent. ) | |
| ) | |

## DECLARATION OF LAKRESHA MOULTRIE

I, LaKresha Moultrie, declare as follows:

1.      I am a resident of the State of Delaware.  I am over the age of 18. This declaration is based upon my personal knowledge, information acquired by me in the course of my official duties, information contained in the records and systems of the Delaware Department of Labor ("DDOL") to which I have access, and information conveyed to me by other knowledgeable DDOL employees with whom I work on a regular basis. If called as a witness, I could testify competently to the matters set forth below.

## Professional and Agency Background

1

2.      I am the Secretary of the DDOL. I was appointed by the Governor and confirmed by State Senate of the State of Delaware on January 30, 2025. Immediately prior to my role as Secretary, from 2019 to January 2025, I was Vice President of Legal Affairs, General Counsel, and Chief Enterprise Risk Officer at Delaware State University. Prior to that, I served eight years in the Delaware Department of Justice in an ascending number of posts, ultimately serving as the Chief Deputy Attorney General.

3.      DDOL is the state agency housing the Divisions of Unemployment Insurance, Employment and Training, Industrial Affairs, Paid Family Leave, Office of Occupational and Labor Market Information, and Vocational Rehabilitation. DDOL connects people to jobs, resources, monetary benefits, workplace protections, and labor market information. DDOL's mission is to promote financial independence, workplace justice, and a strong economy. I am responsible for the administration of the activities of DDOL, including the Division of Unemployment Insurance ("DDOL/UI").

4.      One of my department directors is the Director of DDOL/UI. The current Director is Marie Cameron ("Cameron"). In the timeframe relevant to DDOL/UI's receipt of the U.S. Department of Homeland Security's ("DHS") Immigration Enforcement Subpoenas dated March 4 and April 7, 2025, the acting Director of DDOL/UI was Rachel Turney ("Turney"). Turney is one of my direct

reports. Prior to Turney, the Director was Darryl Scott ("Scott"). At that time, Scott was a direct report to Turney.

5.    DDOL/UI is the Division within DDOL that serves workers who are unemployed through no fault of their own by providing temporary partial wage replacement for qualifying unemployed workers while they seek new employment. DDOL/UI also makes referrals to re-employment services.

6.    DDOL/UI's mission is to improve the quality of life for Delaware's residents by minimizing the impact unemployment has on the individual, their family, and community. DDOL/UI also serves employers by ensuring that only those unemployed individuals meeting all eligibility criteria receive unemployment insurance benefits, thereby reducing the need for future increases in employer assessment rates and protecting the solvency of the State of Delaware's Unemployment Insurance Trust Fund ("the UI Trust Fund").

7.    The administration and operation of DDOL/UI is funded by an annual operating grant from the U. S. Department of Labor ("U.S. DOL"). Operational expenses that exceed the amount of the federal grant funds are paid from state funds, *i.e.* penalties and interest paid by employers for late filings or payments, or by a special employer assessment. There is no state budget appropriation that funds DDOL/UI.

3

8.      All businesses with employees working in Delaware are required to file with DDOL/UI a Form UC-8 wage report each quarter ("wage report"). DDOL/UI's wage report form requires every business to disclose administrative and financial information, including its total number of employees and the aggregate total gross, excess and taxable wages paid to its employees in that quarter. It further requires businesses to disclose the name, social security number and gross covered wages for each individual employee paid that quarter.

9.      Businesses with employees in Delaware are required to pay a quarterly UI tax assessment. This tax liability is determined for each business based on their tax assessment rate applied to the wage information provided in its quarterly wage report. Employers must satisfy their tax liability to DDOL/UI at the time of filing their quarterly wage report. The Form UC-8 wage report includes a "payment coupon," which identifies the employer by name and account number. DDOL/UI utilizes the business's UI Account number to identify a business's data in its system. DDOL/UI also maintains a record of each business's Federal Employer Identification Number ("FEIN") issued by the Internal Revenue Service ("IRS").

10.     If a business fails to file its quarterly wage report and/or fails to pay its quarterly tax assessment to DDOL/UI, the business may be subject to penalties, fines, interest and/or an increased tax assessment rate. The statutory range of penalties is from $100.00 to $450.00. 19 *Del. C.* § 3125(c). Although DDOL/UI can

4

pursue businesses for failing to file quarterly wage reports as required by law, DDOL/UI does not have the resources to pursue enforcement on a larger scale.

11.    The quarterly UI tax assessments paid by employers fund the Delaware UI Trust Fund. Quarterly UI tax assessments are the UI Trust Fund's only source of funding. The UI Trust Fund is the only source of payment of unemployment benefits to qualifying claimants.

12.    Businesses filing their wage reports and satisfying their UI tax assessment obligations is foundational to supporting Delaware's UI system. Maintaining the integrity of the UI Trust Fund by encouraging businesses to comply with reporting and payment is critical. Without sufficient funds to pay UI claimants and sufficient information to process UI claims, the mission and purpose of DDOL/UI to provide economic stability to unemployed Delawareans while they seek new employment collapses.

13.    As Secretary to the DDOL and its Division of UI, the integrity of the UI Trust Fund is of paramount concern. Because the UI Trust Fund is funded by the quarterly tax assessments paid by employers when filing their quarterly wage reports and UI claims are processed by using the information contained in the Form UC-8, DDOL/UI's concomitant policy and statutory obligation is to attentively guard the confidentiality of the financial and employee data submitted by employers. Engendering the faith and trust of businesses in DDOL/UI's commitment to

5

safeguard their confidential information is tantamount to encouraging businesses to comply with Delaware UI law and to ensure DDOL/UI accomplishes its mission to provide for unemployed Delawareans while they seek new employment.

**Confidentiality of Employer Data and Reporting and DDOL/UI Records**

14.    DDOL/UI is authorized through a federal-state partnership that is based upon federal law but administered by DDOL/UI under state law. Federal law defines eligibility requirements that each state's unemployment program must meet. One such eligibility requirement concerns the confidentiality and disclosure of certain unemployment information.

15.    Section 303(a)(1) of the Social Security Act conditions receipt of federal grant money for the administration of Delaware's UI program on Delaware law including "provision for such methods of administration as are found by the Secretary of Labor to be reasonably calculated to insure full payment of unemployment compensation when due." 42 U.S.C. §503(a)(1); 20 C.F.R. §603.4. The U.S. Department of Labor's longstanding interpretation of "methods of administration" that are "reasonably calculated to insure full payment of unemployment compensation when due" is to require state law to protect and maintain "the confidentiality of UC information, which reveals the name or any identifying particular about any individual or any past or present employer or

employing unit, or which could foreseeably be combined with other publicly available information to reveal any such particulars, and must include provision for barring the disclosure of any such information," except as provided for in federal law. 20 C.F.R. §603.4(b).

16.    Federally protected "UC information and State UC information" is defined by federal law as "information in the records of a State or State UC agency that pertains to the administration of State UC law" and includes DDOL/UI's employer quarterly wage reports. 20 C.F.R. §603.2(j).

17.    In its 1997 Directive, *Unemployment Insurance Program Letter No. 34-97*, the U.S. Department of Labor provided guidance and its interpretation of the confidentiality requirements of the Federal-State UC Program.

> The basis for this prohibition is that disclosure may **discourage individuals claiming benefits from exercising their rights under the law, may deter employers from furnishing information necessary for UC program operations, may impede the 'proper and efficient administration' of the UC program, and may create notoriety for the UC program if the information were misused. Any publicity could have disrupting effects on the operations of the State agency and effect the agency's mission of insuring claimants 'full payment of unemployment compensation when due.'**

> This confidentiality requirement pertains to information required from individuals and employers or employing units for the purposes of administration of the revenue and benefit provisions of State UC laws.[1]

---

[1] https://www.dol.gov/agencies/eta/advisories/unemployment-insurance-program-letter-no-34-97 (emphasis added). Although this guidance document from U. S. DOL is no longer in effect, as it was meant to serve as interim guidance to states until the federal confidentiality rules about the

18.     The federal regulations provide limited exceptions to the confidentiality requirement. As explained herein, the disclosure exceptions are permissive, not mandatory. 20 C.F.R. §603.5.

19.     The Delaware Unemployment Code (title 19, chapters 31 and 33) implements this federal confidentiality requirement, prohibiting disclosure of employer filed reports and the information contained therein, except under limited circumstances. 19 *Del. C.* § 3125(a)(1).

20.     Consistent with federal law and regulations, Delaware UI Regulation 12.5 provides for the limited disclosure of information contained in DDOL/UI records to federal government agencies for purposes other than purposes related to administration of the unemployment laws, provided such disclosure "*will not impede the operation of, and is not inconsistent with the purpose of the Delaware Department of Labor* and is not prohibited by applicable federal law regarding the confidentiality of unemployment insurance program data/information, and is authorized in writing in individual cases by the Delaware Secretary of Labor." 19 *Del. Admin. C.* § 1201 (12.5)(emphasis added).

---

disclosure of unemployment compensation information were enacted (20 C.F.R. part 603), this interim guidance is relevant to explain the policy behind the confidentiality rules.

21.    As mandated by federal and state law and regulations, DDOL/UI vigilantly protects the confidentiality of its records and data, including the quarterly wage reports required to be filed by Delaware employers.

### DDOL/UI's Identification of Businesses

22.    Businesses with employees in Delaware register with DDOL/UI by filing a UC-1 Application. As part of the application itself, businesses include their FEIN provided by the Internal Revenue Service ("IRS"). A FEIN is the business equivalent of a social security number for an individual.

23.    Registered businesses who are determined by DDOL/UI to be financially liable for a UI tax assessment are assigned by DDOL/UI an UI Account Number.

24.    DDOL/UI does not request businesses to provide their Division of Corporations file number on their UC-1 registration application and does not track that file number in its records to identify an employer.

### Data Sharing by DDOL/UI

25.    Businesses rely on DDOL/UI to protect the confidentiality and security of their data and to follow federal and state laws and regulations regarding redisclosure of that data. These include the prohibition against the disclosure of "any information which reveals the name or any identifying particular about any

9

individual or any past or present employer or employing unit, or which could foreseeably be combined with other publicly available information to reveal any such particulars." 20 C.F.R. 603.4(b). For the limited instances where redisclosure of DDOL/UI employer and employee information is permitted under federal and state law, federal and state law require the recipient of DDOL/UI maintain the confidentiality of the data. 20 C.F.R. §603.9; 19 Del. Admin. C. §1201 (12.5).

26.    DDOL/UI shares employer data as permitted by the confidentiality exceptions under the federal and state regulations and Delaware law. 20 C.F.R. § 603.5(e); 19 Del. C. §3125. One relevant exception is disclosure is permitted to "public officials" in the "performance of their official duties." 20 C.F.R. 603.5(e); 19 *Del. Admin. C.* § 1201 (12.5). "Performance of official duties" means administration or enforcement of law or the execution of the official responsibilities of a Federal, State, or local elected official." 20 C.F.R. § 603.5(e) Another exception permits disclosure to officials with subpoena authority. 20 C.F.R. § 603.5(h); § 603.7. These exceptions are not mandatory. "In order to share confidential UC Information for a purpose not related to administration of the unemployment system with federal or state public officials with or without subpoena authority under state law, the Division must determine that the disclosure is not prohibited by federal law or regulations, and that disclosure is not inconsistent with the purpose of the Delaware Department of Labor." 19 *Del. Admin. C.* § 1201 (12.5).

27.    In the ordinary course of DDOL/UI operations, the Department receives and complies with investigative subpoenas (and other less formal types of requests) from numerous local, state and federal agencies. Such requests routinely arrive as administrative subpoenas from the issuing agency pursuant to those agencies statutory authority to conduct investigations without recourse to a judicially issued warrant.

28.    HSI is a federal law enforcement agency within the U. S. Department of Homeland Securities, Immigration and Customs Enforcement Division. According to HSI's website, the agency "conducts federal criminal investigations into the illegal movement of people, goods, money, contraband, weapons, and sensitive technology into, out of, and through the United States." *See,* https://www.ice.gov/about-ice/hsi. HSI's investigations include drug and weapons smuggling, cyber and financial crime, illegal technology exports and intellectual property crime, [and] child exploitation, human trafficking, financial fraud and scams, and other crimes against vulnerable populations.

29.    Between February 4 and April 7, DHS issued five (5) Immigration Enforcement Subpoenas to DDOL/UI:

      a. Subpoena Number HSI-WM-2025-031507-001, dated February 3, 2025, requested production of a wage report for the fourth quarter of 2024 for one specific individual, who was identified by name and social security number.

b. Subpoena Number HSI–WM–2025–029751–001, dated February 3, 2025, requested wage reports filed by three (3) businesses for the third and fourth quarter of 2024. The subpoena provided the name and address of each business, but did not include the businesses' FEIN numbers.

c. Subpoena Number HSI–WM–2025–032366-001, dated February 7, 2025, requested wage reports filed by seven (7) businesses for the third and fourth quarter of 2024. The subpoena provided the name and address of each business, but did not include the businesses' FEIN numbers.

d. Subpoena Number HSI–WM–2025–038995-001, dated March 4, 2025, requested wage reports filed by ten (10) businesses for the third and fourth quarter of 2024. The subpoena provided the name and address of each business, but did not include the businesses' FEIN numbers, except for one.

e. Subpoena Number HSI–WM–2025–048065-001, dated April 7, 2025, requested wage reports filed by fifteen (15) businesses for the third and fourth quarters of 2024. The subpoena provided the name and address of each business, but did not include the businesses' FEIN numbers, except for one. The records of fourteen (14) of the listed businesses were previously the subject of the February 3, February 7, and March 4, 2025, administrative subpoenas. One new business was added, whose name was only a slight variation of another business that was named in the March 4th and April 7th subpoenas.

30.    All five (5) subpoenas contained the boilerplate request that DDOL/UI "not to disclose the existence of the subpoena for an indefinite period of time." There is no indication in DDOL/UI's files or from staff or email communications or otherwise that DHS *ever* communicated to DDOL/UI that any of the subpoenas were required to be kept confidential. Nonetheless, based upon a request at the bottom of

each subpoena, and in good faith, DDOL/UI did not disclose the existence of the subpoenas to the target businesses.

31.     All five (5) subpoenas were emailed to Crystal Wimbush ("Wimbush"), who was then the administrative assistant to the former DDOL/UI Director Scott and later to Director Turney. Wimbush was at all relevant times the DDOL/UI's "subpoena processor," who communicated directly with Special Agent Kimberly Caraway ("Caraway").

32.     The basic internal procedure upon DDOL/UI's receipt of an administrative subpoena is for the subpoena processor to forward the subpoena to the Director to : (1) confirm whether the subpoena is proper and determine whether the subpoena seeks production of  confidential UI information; (2) determine whether DDOL/UI has information in its records that are responsive to the subpoena; and (3) if the information sought is confidential UI data, determine whether disclosure is permitted by an exception to the statutory and regulatory prohibitions against disclosure. If disclosure is authorized pursuant to an exception, the Director, in consultation with the Secretary, must then determine whether said disclosure "will not impede the operation of, and is not inconsistent with the purpose" of the DDOL/UI. 19 *Del. Admin. C.* § 1201 (12.5).

33.     DDOL/UI will not release any of its employer filed data unless either the request provides the business' FEIN number or, alternatively, if the FEIN

number is not provided, the business' legal name and address provided on the request must match exactly the business' legal name and address in DDOL/UI's database.

34.    Subpoena  Number  HSI-WM-2025-031507-001  requested  wage records for one individual. Because DHS provided specific identifying information (social security number) for the individual whose wage records were requested, DDOL/UI complied with the subpoenas.

35.    With respect to Subpoena Numbers HSI–WM–2025–029751–001 (February 3, 2025 – 3 businesses), HSI–WM–2025–032366-001, (February 7, 2025 – 7 businesses),  HSI–WM–2025–038995–001, (March 4, 2025 – 10 businesses), and HSI–WM–2025–048065–001, (April 7, 2025 – 15 businesses) for the wage reports of a total of twenty-one (21) businesses, I made the decision that DDOL/UI would not produce the requested records.  Initially, my decision was based on discrepancies between many of the businesses names and addresses as listed in the subpoenas when compared to the businesses names/addresses in DDOL/UI's database. Because the businesses' FEIN numbers were not included on the Subpoenas (except for one business on listed on both the March 4 and April 7, 2025, Subpoena), DDOL/UI could not verify with accuracy that the information sought was within its records.

36.    Wimbush communicated extensively with Caraway regarding the deficiencies in the Subpoena Numbers HSI–WM–2025–029751–001, HSI–WM–2025–032366-001,    and    HSI–WM–2025–038995–001.    Wimbush    repeatedly

requested the relevant FEIN numbers be provided. *See*, Caraway Declaration, Exhibit A to Pet. Mtn to Enforce, ¶¶16-18.

37.    On February 10, 2025, in an email responding to Caraway's email of the same date (in which Caraway sent DDOL/UI the Subpoena Number HSI-WM-2025-032366-001 dated February 10, 2025), Wimbush stated to Caraway in an email, "I was informed that we need FEIN number to do an accurate pull of information. You can put them in the body of the email."

38.    On February 11, 2025, Wimbush emailed Caraway. In reference to Subpoena Number HSI–WM–2025–029751–001, Wimbush said, "We are still working on these and require 15 business days to pull information. Do you have FEIN # to ensure accurate information?" No response was received specifically to this email until March 26, 2025.

39.    On February 14, 2025, Wimbush again emailed Caraway, following up on her email of February 11, 2025, regarding Subpoena Number HSI–WM–2025–029751–001. No response was received specifically to this email.

40.    On March 4, 2025, Caraway emailed Subpoena Number HSI–WM–2025–038995-001 and inquired about the status of the response to Subpoena Numbers HSI–WM–2025–029751–001 and HSI-WM-2025-032366-001.

41.     On March 25, 2025, Caraway sent an email to Wimbush stating, "checking on the status of the three subpoenas…It has been almost two months since the first, past the 15 days requested.  Please advise as soon as possible."

42.     The next day, on March 26, 2025, Wimbush responded to Caraway's March 4, 2025, email in which Caraway asked for the status of the two prior subpoenas.

> I sent you a response to the first subpoena letting you know the Division of Unemployment Insurance needs FEIN numbers for all employer entities listed on subpoenas. Your subpoenas did not contain FEIN numbers. There may be multiple employers using the same address, and there are often multiple employers with similar names on file with the Division, so FEINs clearly identify which employer entity is contained in your subpoena. Can you reissue your subpoenas with FEIN numbers included.

43.     Additionally, in the March 26th email to Caraway, Wimbush stated,

> Also, you mention below two previous subpoenas. We only got one previous subpoena and this one below (2 total).  If there are 3 total, we are missing one.  Can you resend them all, so we can see which one we did not get?... All three need FEIN numbers.[2]

44.     Caraway responded to Wimbush on March 26th stating,

> Per our previous discussion, you informed me that file numbers were ok and I forwarded you file numbers for all the companies we requested documents for. I just want to verify, are file numbers no longer acceptable?

45.     On April 2, 2025, Wimbush responded to Caraway:

---

[2] There had been internal lack of communication in DDOL/UI due to Wimbush not processing or forwarding Subpoena HSI–WM–2025–032366-001 sent on February 10th to anyone else at DDOL/UI.

Some requests can take some time depending on amount of information found or delays can be due to the number of requests received. You and I have had several emails back and forth and in one of them you stated if the file numbers were still acceptable. What does the file number correspond with? Also, I previously asked about 2 other subpoenas you mentioned I had. Please provide me with the names of the subpoenas. I know we haven't had this issue in the past, but I want to confirm I have all and see if I can get help with them.

46.    On April 4, Wimbush sent a follow up email to Caraway.

47.    Caraway responded on April 7, attaching Subpoena Number HSI-WM-2025-048065-001 (the Subpoena at issue) and the February 3rd, February 10th, and March 4th subpoenas. Caraway explained the file number for each of the businesses listed on the new subpoena are the "identifiers" assigned to each business by the Division of Corporations.

48.    Caraway further advised DDOL/UI Subpoena Number HSI-WM-2025-048065-001 superseded the Subpoenas dated February 3, 2025, February 7, 2025, and March 4, 2025.

**Harm from Potential Disclosure of Delaware Wage Reports**

49.    Based on my knowledge, experience, and the facts as they developed between February 3, 2025 – April 7, 2025, I believe production of the requested wage records would likely interfere with the efficient administration of Delaware's UI law, whose mission is to provide economic stability to Delawareans through the

payment of unemployment compensation benefits. The DDOL/UI cannot accomplish its mission without sufficient funds in the UI Trust Fund and/or sufficient information to process UI claims. The solvency of the UI Trust Fund is dependent on employers filing their wage reports and paying their quarterly tax assessments.

50.     Moreover, to process UI claims, DDOL requires the information contained in the Form UC-8.  The Division must review a UI claimant's wages for approximately the year preceding the filing of a claim to determine if the claimant is qualified to receive benefits and to determine the amount of weekly benefits they are eligible to receive. The Division has no access to the amount of individual employee wages paid by employers other than through the UC-8 forms that require employers to list its employees by name and provide their social security number and the total amount of wages paid in that quarter.  The UC-8 serves two purposes – calculating employer's tax and determining whether and how much benefits a claimant filing for unemployment can be paid.

51.     Were DDOL/UI to produce wage reports to DHS, under the circumstances and in the manner those records were sought in this instance, it is my belief and policy judgment that such disclosure would create a significant and unpalatable risk that employers would choose to protect themselves and the identifying information of their employees by not filing their reports and paying their

assessments. This result would impede the administration of DDOL/UI and undermine the entire purpose of the DDOL/UI system.

52.    In reaching my policy decision that disclosure of wage reports was contrary to the effective and efficient administration of Delaware UI law and contrary to the purpose of the DDOL/UI, among the facts I considered were the following:

a. Within one month, between February 3, and March 4, 2025, ICE served DDOL/UI with three administrative subpoenas for the wage reports of 20 employers. Despite repeated requests, no FEIN numbers were provided by Caraway and Caraway's responses to emails were not consistently timely.

b. All the Subpoenas for wage reports were "Immigration Enforcement Subpoenas" and the targeted businesses were in labor industries that are often commonly thought to employ people of color, whether those employees are American citizens or not. While DDOL/UI has received and complied with DHS administrative subpoenas in the past, it is unusual, if not unprecedented, for DDOL/UI to receive an ICE immigration enforcement administrative subpoena for wage records in connection with solely civil immigration enforcement. A recent search of DDOL/UI records revealed DHS has historically issued administrative subpoenas for wage records in connection with DHS *criminal* investigations, such as fraud/identity theft, controlled substances enforcement and child exploitation, but not in matters of civil immigration enforcement only.

c. The superseding April 7, 2025, Subpoena was not consistent with the subpoenas DDOL/UI received from DHS in February and March, 2025. The April 7th Subpoena sought the wage reports of fifteen (15) businesses, some of whose records were the subject of the first three subpoenas, some were not. The fact that some of the businesses whose records were requested in the earlier subpoenas were no longer of

19

interest to DHS[3] raised very serious concerns. Among those concerns was whether DHS sought the records solely for the purpose of conducting disruptive raids at the locations of the various businesses,[4] as the risk of undermining the stability of business operations in Delaware and/or in any way discouraging businesses from filing and satisfying their DDOL/UI obligations would be contrary to the efficient administration of the DDOL/UI and undermine the adequacy and longevity of the UI Trust Fund.[5]

d. The employee identifying information contained in the employer filed wage reports is available to DHS through the inspection of I-9 Forms that employers are required to maintain under federal law.

53.    Trust is essential to the administration of Delaware UI law. For DDOL/UI to function effectively, employees must feel safe providing accurate and complete information to DDOL/UI to access timely, appropriate benefits. Employers

---

[3]  The April 7th subpoena did not request records: for one (1) business listed in the February 3rd subpoena; three (3) businesses listed in the February 10th subpoena; and two (2) businesses listed in the March 4th subpoena. (One new business was added to the April 7th subpoena.). Had DDOL/UI staff disclosed the wrong employer's confidential information, the staff would be subject to penalties, including fines or imprisonment. 19 *Del. C.* § 3125(b) ("Any employee of the Department, an appeal tribunal or the Unemployment Insurance Appeal Board who violates any provision of this section shall be fined not less than $23 nor more than $230 or imprisoned not more than 90 days or both.").

[4]  It was commonly known that the federal administration gave ICE field offices an arrest quota of 75 arrests a day and that workplace raids were a disruptive tactic that DHS was utilizing in it enforcement of immigration laws.  Nick Miroff & Maria Sacchetti, *Trump Officials Issue Quotas to ICE Officers to Ramp Up Arrests*, The Washington Post (last updated Jan. 26, 2025), https://www.washingtonpost.com/immigration/2025/01/26/ice-arrests-raids-trump-quota/; Mark Moran, *ICE Detains More than 530 People in Workplace 'Raids' in U.S. Northeast*, United Press International (Jan. 23, 2025), https://www.upi.com/Top_News/US/2025/01/23/ice-details-538-ion-workplace-raids/7811737692376/.

[5]  ICE raids were conducted in Sussex County, Delaware in March 2025, which were reported locally by media as causing disruption and a refusal by some tradie workers to drive work vans to job sites Jose Ignacio Castaneda Perez, *'Incredibly Dystopian': ICE Enforcement Upends Lives for Rural Delaware Communities*, Delaware Online/The News Journal (August 8, 2025), https://www.delawareonline.com/story/news/local/2025/08/08/rural-delaware-communities-upended-by-inrice-enforcement-upends-lives-for-rural-delaware-communities/85557370007/ (reporting on DHS' Delaware immigration enforcement efforts in March, 2025).

must feel confident that their confidential business information in wage reports will be protected by DDOL/UI and that the confidential wage and identifying information of their employees will be used for its intended purpose: to calculate employer tax liability and determine employee eligibility for unemployment benefits.

54.    If Delaware businesses fear their wage reports may be shared, there is a significant and legitimate concern that they will likely disengage from the UI system altogether, *i.e.* businesses would not file their reports and DDOL/UI would not be able to assess their tax liability to the UI Trust Fund. The significant risk that disclosure of the wage reports for civil immigration enforcement could effectively intimidate businesses into violating Delaware law (and thereby jeopardize the UI system as claims are paid from the UI Trust Fund that is funded by employer tax assessments) weighed heavily in my determination that disclosure would erode employers and the workforce's trust the UI system. An erosion of employers' trust in DDOL/UI's protection of their confidential information would likely impair DDOL/UI's ability to administer UI program equitably, efficiently and reliably.

55.    Based on my knowledge and experience, I made the policy decision that disclosure of the confidential wage reports by DDOL/UI to DHS in response to Subpoena Number HSI–WM–2025–048065-001, dated April 7, 2025, for the purpose of civil immigration enforcement *only* would negatively impact the

administration of Delaware's UI law and impede the mission of DDOL/UI to provide

UI benefits to Delawareans.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 19, 2025, at Wilmington, Delaware.

LaKresha Moultrie
Secretary of the Delaware Department of Labor

22