# Exhibit B

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| ) | |
| In Re: Administrative Subpoena ) | |
| ) | No. 1:25-mc-91324-MJJ |
| No. 25-1431-019 ) | |
| ) | |
| _____ ) | |

## <u>MEMORANDUM OF DECISION</u>

September 9, 2025

JOUN, D.J.

On June 11, 2025, the Department of Justice ("DOJ") served The Children's Hospital

Corporation d/b/a Boston Children's Hospital ("BCH") with an administrative subpoena issued

pursuant to 18 U.S.C. § 3486, which authorizes, in part, the issuance of an administrative

subpoena "[i]n any investigation of . . . a Federal health care offense." 18 U.S.C. §

3486(a)(1)(A)(i)(I). The subpoena was issued to BCH, along with numerous other hospitals

across the country, seeking the production of information and documents relating to the

hospital's provision of gender-affirming care ("GAC"). The subpoena was purportedly issued to

investigate whether BCH was engaged in unlawful off-label promotion of puberty blockers and

cross-sex hormones in violation of the Food, Drug, and Cosmetic Act ("FDCA") and other false

claims that may have been submitted to federal healthcare programs. The subpoena contains 15

separate requests for documents related to BCH's staff, patients, and provision of GAC. [*See*

Doc. No. 4 at 17]. Before me is BCH's Motion to Quash the subpoena, [Doc. No. 3], as well as

BCH's Motion to Seal the case, [Doc. No. 2].

## I.    BACKGROUND

BCH is one of the largest leading pediatric hospitals in the nation. It is dedicated to improving and advancing the health and well-being of children through its work in clinical care, biomedical research, medical education, and community engagement. [Doc. No. 4 at 9]. BCH is also home to the first pediatric and adolescent transgender health program in the United States. [*Id.* at 10]. Major medical organizations in a variety of specialties recognize gender dysphoria as a medical condition in individuals who may experience a conflict between the sex they were assigned at birth and the gender with which they identify, which can cause extreme distress and can lead to severe depression, anxiety, and suicidal ideation. [*Id.*]. Doctors have described GAC as a medical necessity. [*Id.* at 10–11]. BCH offers GAC in the form of physical and psychological assessments, ongoing medical care, and therapy and support groups, and has also invested in research and training related to GAC. [*Id.* at 10]. In Massachusetts, "[a]ccess to … gender-affirming health care services is a right secured by the constitution and laws of the commonwealth. Interference with this right, whether or not under the color of law, is against the public policy of the commonwealth." Mass. Gen. Laws ch. 12, § 11I ½(b).

The Administration has taken a firm stance against GAC, making its disapproval of the transgender community well known and terminating GAC a priority. On his first day in office, President Donald J. Trump issued Executive Order 14168, titled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."[1] The Executive Order declares that gender identity is a "false" idea and that the United States only

---

[1] *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, The White House (January 20, 2025), https://tinyurl.com/227z34e3.

recognizes "two sexes, male and female" which are "not changeable."[2] The Administration has issued several other executive orders prohibiting transgender individuals from serving in the military, eliminating federal funding from schools that support "gender ideology," and banning transgender women and girls from competing in sports aligned with their gender identity. [Doc. No. 4 at 13].

On January 28, 2025, President Trump issued Executive Order 14187, aimed at restricting access to medical care for transgender youth.[3] The goal of the Order is to end GAC. The Order accuses medical providers of GAC of "maiming and sterilizing" children or engaging in "mutilation," and states that "[t]his dangerous trend will be a stain on our Nation's history, and it must end."[4] On April 22, 2025, Attorney General Pamela Bondi issued a memorandum, titled "Preventing the Mutilation of American Children," directing the Civil Division of the DOJ to "act decisively to protect our children and hold accountable those who mutilate them under the guise of care" and "to undertake appropriate investigations of any violations of the [FDCA] by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'"[5]

On June 11, 2025, the Civil Division issued a memorandum (hereinafter, the "Civil Division memo") that stated that the Division will use "all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities

---

[2] *Id.*

[3] *Protecting Children from Chemical and Surgical Mutilation*, The White House (Jan. 28, 2025), https://tinyurl.com/mwadx9cw.

[4] *Id.*

[5] Memorandum from Attorney General, *Preventing the Mutilation of American Children*, Office of the Attorney General, at 3-4 (April 22, 2025), https://tinyurl.com/2b9kaja7.

consistent with these directives," and "hold accountable those who mutilate [children] under the guise of care" and pursue investigations of "radical gender experimentation."[6] The Civil Division memo states expressly that these investigations include possible violations of the FDCA regarding drugs dispensed in connection with GAC, as well as possible violations of the False Claims Act against health care providers that bill the federal government for "impermissible services," which includes providers that attempt to "evade state bans on gender dysphoria treatments by knowingly submitting claims to Medicaid with false diagnosis codes."[7]

On June 11, 2025, the same day the Civil Division memo was issued, the DOJ served BCH with an administrative subpoena pursuant to 18 U.S.C. § 3486, seeking the production of documents related to BCH's staff and its provision of GAC. [Doc. No. 4 at 17; Doc. No. 5-1]. The 15 document requests include, but are not limited to, requests for any and all information regarding BCH's personnel, documents, and communications regarding the use of billing codes in connection with GAC for minor patients; communications with pharmaceutical manufacturers regarding the use of puberty blockers or hormones in connection with GAC for minor patients; and documents and medical records of patients, including patients' social security numbers and home addresses. [Doc. No. 4 at 17]. In addition to investigating billing fraud as outlined in the Civil Division memo, the Government claims that it is "conducting an investigation into, among other things, whether off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors violated federal law, including the Food, Drug, and Cosmetic Act ("FDCA")." [Doc. No. 21 at 1].

---

[6] Memorandum from Assistant Attorney General Brett A. Shumate, *Civil Division Enforcement Priorities,* Office of the Assistant Attorney General, at 2-3 (June 11, 2025), https://tinyurl.com/mr3bym4f.

[7] *Id.* at 3.

## II.   ANALYSIS

### A.   <u>Motion to Seal</u>

"A case filed in federal court and the documents filed in the case are presumed to be public." *Morgan v. Middlesex Sheriff's Office*, No. 14-cv-10659, 2014 WL 4104173, at *6 (D. Mass. Aug. 13, 2014). "Public access to judicial records and documents allows the citizenry to monitor the functioning of our courts, thereby insuring quality, honesty and respect for our legal system." *FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987) (citation omitted). The public's interest in accessing court files "is accentuated in cases where the government is a party: in such circumstances, the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch." As such, "only the most compelling reasons can justify non-disclosure of judicial records." *Id.* at 410 (citation omitted).

Still, I acknowledge that "the right to inspect and copy judicial records is not absolute . . . and access has been denied where court files might have become a vehicle for improper purposes." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978) (describing the courts' "supervisory power" to ensure that records are not used for improper purposes such as to "gratify private spite or promote public scandal," promote libel, or publicize "business information that might harm a litigant's competitive standing"). However, in such circumstances, Rule 26(c) of the Federal Rules of Civil Procedure provides that parties seeking to file a document under seal must demonstrate that "good cause" exists to do so. *Dunkin Donuts Franchised Restaurants, LLC v. Agawam Donuts, Inc.*, No. 07-cv-11444, 2008 WL 427290 at *1 (D. Mass. Feb. 13, 2008). Good cause exists where the moving party demonstrates "the harm that would be sustained if the court did not allow the filing under seal." *Id.*

BCH argues that both the text of the statute and the principles of grand jury secrecy supply the bases for sealing here. I address each of these arguments in turn.

**1.  18 U.S.C. § 3486**

BCH points to Section 3486 in support of sealing, which provides that the Government "may issue an ex parte order that no person or entity disclose to any other person or entity . . . the existence of" the subpoena upon a "showing that . . . there is reason to believe that such disclosure may result in" the "endangerment to the life or physical safety of any person" or "intimidation of potential witnesses." *See* 18 U.S.C. § 3486(a)(6)(A)-(B)(i) and (B)(iv). BCH argues that if the statute permits the Government to seek issuance of this non-disclosure order, the same reasoning should apply to the subpoenaed party in these unusual circumstances. [*See* Doc. No. 2 at 5]. BCH has not pointed to a case that holds that the statute permits the subpoenaed party to seek such an order. However, even assuming BCH's position is correct, sealing is not warranted.

BCH and its employees have experienced threats of physical violence for providing GAC. BCH proffers several incidents that are cause for serious concern, including bomb threats, threats of violence and harassment, and death threats, all targeted toward BCH employees through abusive telephone calls, emails, social media posts, mail, and even messages submitted through the hospital's online appointment registration system. BCH argues that these threats constitute good cause for sealing. I empathize with BCH's position. However, it is already public knowledge that BCH provides GAC services. Making this case public does not move the needle on this score. The Government has also made public its intent to investigate GAC. On this latter point, I agree with BCH that the Government should not benefit from its own role in letting the cat out of the bag—but the bag has, nevertheless, been opened. *United States v. ISS Marine*

*Servs., Inc.*, 905 F. Supp. 2d 121, 141 (D.D.C. 2012) (unsealing allowed where the "Government's investigation . . . has been public knowledge for some time").

BCH makes an additional argument: that sealing the case is warranted because the public is only generally aware (by the Attorney General's public announcement) that the DOJ has issued these administrative subpoenas on numerous hospitals across the country but is not aware that a subpoena has been served on BCH specifically, and that such knowledge could exacerbate those existing threats. This is not an irrational fear. However, such speculative generalized fear cannot clear the high burden of sealing the entire docket for an unlimited period. Our courts cannot operate in secret. I find that the statute does not provide sufficient basis for sealing here.

### 2.  Secrecy Rules In The Grand-Jury Context

BCH further argues that because the subpoena involves the investigation of a criminal federal healthcare offense, the subpoena should be analogized to the secrecy rules in the grand-jury context. "Prior to an indictment, governmental authorities are under an obligation not to reveal the existence and nature of an investigation concerning individuals who are merely suspected of criminal activities." *Gonzalez-Bernal v. United States*, 907 F.2d 246, 250 (1st Cir. 1990); Fed. R. Crim. P. 6(e). The Supreme Court has recognized that the "grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. of California v. Petrol Stops Nw.*, 441 U.S. 211, 218–219 (1979).

There are similarities as well as differences between grand jury subpoenas and administrative subpoenas. See *Missouri Baptist Med. Ctr. v. U.S. Dep't of Just.*, No. 22-mc-871, 2023 WL 315021, at *2 (E.D. Mo. Jan. 19, 2023) (analogous "due to their functional similarity as an evidence-gathering tool"). Although the underlying investigation here may implicate a criminal fraud investigation, BCH has not pointed to any case holding that the secrecy principles

surrounding administrative subpoenas are as strong as they are for grand jury subpoenas. Further, given that Section 3486 *does* provide a mechanism for non-disclosure, Congress could have chosen to provide additional privacy protections when issuing administrative subpoenas to investigate healthcare fraud but chose not to do so. *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."). I must respect that. What is more, this matter simply aims to resolve the narrow question of whether the administrative subpoena seeking certain documents and information is valid or invalid. For these reasons, keeping the docket sealed is not warranted here.[8]

### B.  <u>Motion to Quash</u>

"Section 3486 authorizes the Attorney General, in any investigation relating to a federal health-care offense, to issue an administrative subpoena requiring 'the production of any records or other things relevant to the investigation' and 'testimony by the custodian of the things required to be produced concerning the production and authenticity of those things.'" *In re Amato*, No. 05-mc-29, 2005 WL 1429743, at *4 (D. Me. June 17, 2005) (cleaned up) (citing 18 U.S.C. § 3486(a)(1)(B)). "[T]he subject of an administrative subpoena has an opportunity to challenge the subpoena before yielding the information." *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 3 (1st Cir. 1996).

---

[8] Nor can I allow what documents that has been filed to remain under seal. BCH has failed to "explain, on a document-by-document basis, why sealing is required and how their request satisfies the applicable legal standard." *Bradford & Bigelow, Inc. v. Richardson*, 109 F. Supp. 3d 445, 447 (D. Mass. 2015); *In re: Subpoena No. 25-1431-014*, No. 25-mc-00039 (E.D. Penn. July 25, 2025) (denying motion to seal the entirety of its motion to quash a similar administrative subpoena issued to a hospital where the hospital did not provide a line-by-line demonstration of the particularized harm allegedly at risk); *see also* District of Massachusetts Local Rule 7.2 (requiring litigants to file a motion for impoundment each time a specific document or group of documents is to be filed, and prohibiting the court from entering "blanket orders" of confidentiality any time a document is to be filed).

"The requirements for enforcement of an administrative subpoena are not onerous. In order to obtain judicial backing the agency must prove that (1) the subpoena is issued for a congressionally authorized purpose, the information sought is (2) relevant to the authorized purpose and (3) adequately described, and (4) proper procedures have been employed in issuing the subpoena." *Id.*; *United States v. Morton Salt Co.*, 338 U.S. 632, 652–53 (1950) (agency's request for documents should be approved by the judiciary so long as it "is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant"); *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 209 (1946) (the court must determine whether the investigation is "authorized by Congress, is for a purpose Congress can order, and the documents sought are relevant to the inquiry"). "The role of a court in a subpoena enforcement proceeding is strictly limited to inquiring whether the above requirements have been met. Such proceedings are designed to be summary in nature." *United States v. Comley*, 890 F.2d 539, 541 (1st Cir. 1989) (citation omitted).

### 1. **Improper Purpose**

While the parties agree that the above standards govern whether a court can enforce an administrative subpoena, they dispute whether there is a "bad faith" exception to the issuance of such a subpoena. BCH relies on the Supreme Court's ruling in *United States v. Powell*, 379 U.S. 48 (1964) to argue that the bad faith exception applies in this case. There, the Court held that the Internal Revenue Service—which was using its subpoena power to seek production of documents from the president of a corporation—need not meet any standard for probable cause. *Id.* at 57. However, the Court held that a court may not enforce an administrative summons if to do so would "permit its process to be abused." *Id.* at 58. The Court specified that "[s]uch an abuse would take place if the summons had been issued for an improper purpose, such as to

harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation. The burden of showing an abuse of the court's process is on the taxpayer." *Id.*

The Government argues that there is no freewheeling "bad faith" exception, citing cases that hold that a court need not make inquiries into the motives behind a lawful investigation. While that proposition is generally true, the Government's argument misses the mark. Evidence of bad faith is relevant to whether an investigation is being pursued for an improper purpose. For instance, in *United States v. Comley*, Comley challenged the enforcement of an administrative subpoena served upon him by the Nuclear Regulatory Commission. 890 F.2d 539. There, upon challenge, the First Circuit first assessed whether the Commission made a prima facie showing of proper purpose and then turned to Comley's argument that the Commission's issuance of the subpoena was "motivated only by bad faith in its investigation of the employee." *Id.* at 542. The First Circuit held that "[i]f Comley's assertions were supported by firm evidence, then we would have adequate justification to deny enforcement of the subpoena." *Id.* (citing *United States v. Westinghouse Elec. Corp.*, 788 F.2d 164, 166–67 (3d Cir. 1986) ("[I]f a subpoena is issued for an improper purpose, such as harassment, its enforcement constitutes an abuse of the court's process.")). In line with these principles, I first assess whether the Government has made its prima facie showing of proper purpose, and then whether BCH has shown that the subpoena was issued for an improper purpose.

The Government argues that the subpoena is valid and enforceable. First, the Government argues the statute authorizes the DOJ to issue a subpoena in connection with an investigation of federal healthcare offenses, 18 U.S.C. § 3486(a)(1)(A)(i)(I). Second, the Government argues that the subpoena is procedurally sound as it was signed by the Attorney General of the United

10

States, served on BCH, and calls for the production of documents relevant to an investigation within 500 miles of BCH. Third, the Government argues that its requests are relevant to the purpose of its investigations "[b]ecause BCH is an acknowledged provider of the type of health care services under investigation," and as such, "the individual requests— which seek records related to the provision of those services—are also valid under the statute." [Doc. No. 21 at 14]. I find that, while the Government has made a prima facie showing that it is authorized by statute to issue a subpoena if it relates to a federal healthcare offense, significantly, the Government has failed to show proper purpose. The Government has not submitted any affidavits or other evidence to show proper purpose. *See Comley*, 890 F.2d at 541 ("[T]he affidavits of government officials have been accepted as sufficient to make out a prima facie showing that these requirements are satisfied."). Instead, the Government simply points to the April 22, 2025 Memorandum of the Attorney General directing the Civil Division "to undertake appropriate investigations" to make the argument that since the Government would not have issued the subpoena unless it was for an "appropriate" investigation, the subpoena must have been issued for a proper purpose. This logic, if followed, would preclude any form of judicial review as the Government's self-proclaimed say-so would always be sufficient to defeat a motion to quash. This is no logic at all.

Numerous statements by the Administration, executive orders, and memorandums, detail the Administration's goal of ending GAC. While portions of these statements also refer to suspicions of improper billing practices and unlawful off-label promotion, the Government has not provided any support that the information sought by the subpoena is limited to these potential healthcare offenses, as opposed to the Government's stated goal of ending GAC. To be clear, the Government cannot broadly make inquiry into the provision of GAC generally—any such

inquiry must be limited to the healthcare fraud that is authorized by the statute: fraudulent billing codes and unlawful off-label promotion. That is not the case here.

The requests seek an astonishingly broad array of documents and information that are virtually unlimited in scope. For example, Request Nos. 1, 11, and 12 seek the personnel files of nearly all 2,000 individuals who work for BCH in any capacity, not limited to their employment as it relates to GAC. They also seek all medical records and personal information of patients who have been provided with GAC, including their social security numbers and home addresses, despite the tenuous link these medical records (or their personal information) would have to potential fraudulent billing codes and unlawful off-label promotion. Requests Nos. 7-10 are similarly overbroad, seeking documents and communications with pharmaceutical manufacturers, sales representatives, marketing departments, and medical science liaisons regarding the treatment of gender dysphoria and the use of puberty blockers or hormones generally.

The Government seeks all this while not offering an iota of suspicion that BCH is actually engaging in fraudulent billing practices or off-label promotion in the first instance.[9] The Government may be correct that it need not provide probable cause for its investigations, but it cannot use its subpoena power to go on a fishing expedition. *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1418 (D.C. Cir. 1994) (quashing subpoena to the extent that the agency sought "unfettered authority to cast about for potential wrongdoing"). *United States v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973) ("The Government cannot go on a "fishing

---

[9] Indeed, the Government acknowledges that it "has not made a decision as to whether BCH is a target . . . BCH *may* be simply a witness to, for example, pharmaceutical companies promoting puberty blockers for off-label use. Or it *may* be a witness to whom other people or entities directed false statements on the topic of pharmaceutical treatments in gender-related care for minors. Or BCH personnel *may* have committed federal health care offenses without the knowledge of BCH management." [Doc. No. 21 at 13 (emphasis added)].

expedition" . . . and where it appears that the purpose of the summons is "a rambling

exploration" of a third party's files, it will not be enforced") (citations omitted).

Context is important. For example, a statement made by a DOJ representative at the

Federal Trade Commission recently claimed that the agency was "working on" getting GAC to

"stop even in blue states."[10] After President Trump issued his Executive Order directing the

Attorney General to prioritize investigations into GAC, the White House issued an article that

boasted how several hospitals and healthcare systems have stopped providing GAC entirely.[11]

These statements have no connection to the Government's asserted purpose of stopping alleged

fraudulent billing practices or unlawful off-label promotion.

The Government's publicly stated goal of issuing these subpoenas is also in direct

contradiction with the Massachusetts constitution, which provides for the right to GAC. *United

States v. Skrmetti*, 145 S. Ct. 1816 (2025) ("We afford States wide discretion to pass legislation

in areas where there is medical and scientific uncertainty.") (citation omitted). In its Civil

Division memo, the Government noted that part of its investigation includes investigating

whether providers are attempting to "evade state bans on gender dysphoria treatments by

knowingly submitting claims to Medicaid with false diagnosis codes."[12] But Massachusetts does

not ban GAC. And there exists a diagnosis code for GAC for billing purposes. It is thus difficult

to understand what exactly the Government is trying to investigate BCH for.

---

[10] *See* FTC, *The Dangers of "Gender-Affirming Care" for Minors*, at 29 (July 9, 2025), https://tinyurl.com/mrap7e2f.

[11] *See President Trump Promised to End Child Sexual Mutilation — and He Delivered*, The White House (July 25, 2025), https://tinyurl.com/2dhcwjdd.

[12] The Civil Division Memo, at 3.

The Administration has been explicit about its disapproval of the transgender community and its aim to end GAC. The subpoena reflects those goals, comprising overbroad requests for documents and information seemingly unrelated to investigating fraud or unlawful off-label promotion. It is abundantly clear that the true purpose of issuing the subpoena is to interfere with the Commonwealth of Massachusetts' right to protect GAC within its borders, to harass and intimidate BCH to stop providing such care, and to dissuade patients from seeking such care. For the above reasons, I find that the Government has failed to show proper purpose and, even if it had, that BCH has demonstrated that the subpoena was issued for an improper purpose, motivated only by bad faith.

**III.    CONCLUSION**

For the above reasons, BCH's Motion to Seal is <u>DENIED</u> and BCH's Motion to Quash is <u>GRANTED</u>.

SO ORDERED.

<div style="margin-left: 40%">

<u>/s/ Myong J. Joun</u>
United States District Judge

</div>