IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| | Petitioner, | |
| v. | | Miscellaneous Action<br>No. 25-322-CFC |
| DELAWARE DEPARTMENT OF<br>LABOR, | | |
| | Respondent. | |

Claudia L. Pare, Assistant United States Attorney, THE UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF DELAWARE, Wilmington, Delaware

*Counsel for Petitioner*

Jennifer Kate Aaronson and Ian R. Liston, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware

*Counsel for Respondent*

**MEMORANDUM OPINION**

April 13, 2026
Wilmington, Delaware



COLM F. CONNOLLY
CHIEF JUDGE

Pending before me is the Government's Petition to Enforce Department of Homeland Security Administrative Subpoena. D.I. 2. The recipient of the subpoena, the Delaware Department of Labor (DDOL), opposes the Petition.

I.

The subpoena was issued by Homeland Security Investigations (HSI). HSI is one of three so-called "operational directorates" of U.S. Immigration and Customs Enforcement (ICE). U.S. Immigr. & Customs Enf't, https://www.ice.gov/about-ice [https://perma.cc/A45S-PC9V] (last visited Apr. 9, 2026). ICE is a component of the Department of Homeland Security (DHS). *Operational and Support Components*, Dep't of Homeland Sec., https://www.dhs.gov/operational-and-support-components [https://perma.cc/JLK4-D9D6] (last visited Apr. 9, 2026). Section 103 of the Immigration and Naturalization Act (the INA or Act), codified as amended at 8 U.S.C. § 1103(a)(1),[1] "charge[s] [DHS] with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens," with certain exceptions not relevant here. DHS has delegated investigative authority to ICE. *See* DHS Deleg. No. 7030.2 (ICE) (delegating investigative authority from DHS to ICE); 8 C.F.R. § 287.5 (authorizing certain ICE agents to

conduct searches, execute warrants, and make arrests); *see also* U.S. Immigr. & Customs Enf't, *supra* ("Homeland Security Investigations (HSI) is the principal investigative component of DHS . . . ."). The parties used DHS, ICE, and HSI interchangeably throughout their briefing and at oral argument. For ease of reference, I will primarily use DHS.

DHS issued the subpoena pursuant to 8 U.S.C. § 1225(d) and 8 C.F.R. § 287.4. D.I. 4 at 2. Section 1225(d)(4)(A) provides in relevant part that

> any immigration officer shall have power to require by subpoena the attendance and testimony of witnesses before immigration officers and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of [the INA] and the administration of [DHS], and to that end may invoke the aid of any court of the United States.

§ 1225(d)(4)(A).[2] Based on this statutory authorization, § 287.4(a)(1) delegates to DHS Special Agents in Charge and Special Agents in supervisory positions the power to "issue . . . subpoena[s] requiring the production of records and evidence for use in criminal or civil investigations."

The subpoena at issue cites § 1225(d) and § 287.4, and it states that the "production of the indicated records [covered by the subpoena] is required in connection with an investigation or inquiry relating to the enforcement of U.S. immigration laws." D.I. 4 at 2. Kenneth Krauss, the acting Assistant Special

2

Agent in Charge of HSI's Wilmington, Delaware office signed the subpoena. *See* D.I. 4 at 2. DHS served the subpoena on DDOL on April 7, 2025 by means of an electronic system called Egress. D.I. 2-1 ¶ 19. (DHS had regularly used Egress before April 7 to serve subpoenas on and communicate with DDOL. D.I. 2-1 ¶ 14.) The subpoena required DDOL to produce to HSI Special Agent Kimberly Caraway by April 18 the wage reports that fifteen Delaware businesses filed with DDOL for the third and fourth quarters of 2024. *See* D.I. 4 at 2, 4–5. For each of the fifteen businesses, the subpoena provided a name, address, and the unique seven-digit "file number" issued by the Delaware Division of Corporations for that business. *See* D.I. 1 at 4–5; *see also* D.I. 2-1 ¶¶ 16 n.2, 19.

Wage reports are a creature of the Social Security Act (SSA). Section 1137 of the SSA, codified at 42 U.S.C. § 1320b-7, requires each state to have "an income and eligibility verification system" under which "employers . . . in [that] State are required . . . to make quarterly wage reports to a State agency (which may be the agency administering the State's unemployment compensation law)." § 1320b-7(a)(3). The purpose of wage reports is to "provid[e] employment related income and eligibility data" that "may be useful in verifying [an individual's] eligibility for, and the amount of, benefits available [to that individual] under" federally funded programs for the poor, elderly, and needy that are administered by the states. *See* § 1320b-7(a)(2)–(3), (b). Examples of such programs include

Medicaid, unemployment compensation, supplemental security income, and supplemental nutrition assistance. *See* § 1320b-7(b)–(c). Employers must disclose in their wage reports the names and social security numbers of their employees and the wages paid to each employee during the relevant quarter. *See* 20 C.F.R. § 603.2(j)–(k) (defining "unemployment compensation (UC) information" and "wage information"); *see also* 45 C.F.R. § 205.51(c) (defining the wage information to be contained in quarterly wage reports collected by state agencies). DDOL administers Delaware's UC program and maintains the wage reports filed by Delaware employers in accordance with Title 19 of the Delaware Code. Delaware employers are required to submit their wage reports to DDOL using so-called UC-8 forms that can be downloaded from DDOL's website. *See* 19 Del. Admin. C. § 1202(3.2); D.I. 32-1; Del. Dep't of Lab., Employer's Quarterly Report – Forms Set, https://laborfiles.delaware.gov/main/dui/forms/ Quarterly%20Tax%20Report%20-%202019.pdf [https://perma.cc/JZ2C-EFKX] (last visited Apr. 9, 2026) [hereinafter *UC Forms*].

DDOL ignored the subpoena. And so, on June 3, 2025, the U.S. Attorney's Office for the District of Delaware sent Delaware's Secretary of Labor, LaKresha Moultrie, a letter and a copy of the subpoena by certified mail. D.I. 2-2. The letter informed Secretary Moultrie that the subpoena had been served on DDOL in April, that her department had not complied with the subpoena, that DHS had asked the

U.S. Attorney's Office to file a legal action in this Court to enforce the subpoena, and that DDOL could avoid that legal action by complying with the subpoena by June 20, 2025. D.I. 2-2 at 2. A member of Secretary Moultrie's staff signed the certified mail receipt on June 6, *see* D.I. 2-2 at 5, but neither Secretary Moultrie nor anyone else from DDOL responded to the letter or complied with the subpoena, *see* D.I. 2-1 ¶¶ 24–25.

On July 31, 2025, the U.S. Attorney's Office filed the Petition. D.I. 2. On August 1, I issued an Order directing DDOL to appear in Court on August 6 and show cause why it should not be compelled to comply with the subpoena. D.I. 7. DDOL stated at the August 6 hearing that it intended to oppose the Petition. 8.6.25 Hr'g Tr. (docketed as D.I. 11) 10:9–11. The parties originally set a briefing schedule that spanned almost two months, D.I. 13, and later extended it, D.I. 20; D.I. 28. Briefing was completed November 20. *See* D.I. 31. Based on the Government's willingness to agree to such a schedule, I concluded that there was no urgency for DHS to enforce the subpoena; and therefore, unlike when I convened the show cause hearing within a week of the filing of the Petition, I did not move the Petition to the top of the pile of the more than 100 motions pending before me as of November 20. I held oral argument on the Petition on April 1, 2026.

5

II.

I have jurisdiction over the Petition under 8 U.S.C. § 1225(d)(4)(B).[3]  My

review of the subpoena, however, is "strictly limited," *Univ. of Med. & Dentistry*

*of N.J. v. Corrigan*, 347 F.3d 57, 64 (3d Cir. 2003) (citation omitted), because an

administrative agency's "power of inquisition . . . is not derived from the judicial

function," and "does not depend on a case or controversy for power to get

evidence," *United States v. Morton Salt Co.*, 338 U.S. 632, 642 (1950).  As the

Supreme Court held in *Morton Salt*, "[w]hen investigative and accusatory duties

are delegated by statute to an administrative body," that body "can investigate

merely on suspicion that the law is being violated, or even just because it wants

assurance that it is not." *Id.* at 642–43.  For that reason, the Third Circuit "will not

countenance judicial interference with agency decisions to conduct investigations,

decisions that are committed entirely to agency discretion." *SEC v. Wheeling-Pitt.*

*Steel Corp.*, 648 F.2d 118, 127 (3d Cir. 1981) (en banc).

That said, administrative subpoenas, unlike Congressional subpoenas, are

not self-executing. *Id.* at 123.  And because a district court "acts judicially in a

case or controversy" when it entertains a petition for enforcement of an

administrative subpoena, I must ensure that "the integrity of the judicial process"

"would not be abused by enforcement of the subpoena." *Id.* at 124–25.  "The

burden of showing an abuse of the court's process is on the [party opposing

6

enforcement of the subpoena]." *United States v. Powell*, 379 U.S. 48, 58 (1964).

"[T]his burden is a heavy one." *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316 (1978).

"[T]he abuse of process issue is only reached after the government has made a preliminary showing in support of the [subpoena]." *United States v. McCarthy*, 514 F.2d 368, 372 (3d Cir. 1975). To make that showing, the Government must demonstrate that (1) its investigation has a legitimate purpose, (2) the information sought by the subpoena is relevant to such an investigation, (3) the Government does not already possess the information covered by the subpoena, (4) the Government complied with the administrative steps required by the applicable statute, and (5) the subpoena is not unreasonably broad or burdensome. *Corrigan*, 347 F.3d at 64.

### A.

I turn first then to consider whether the Government has made the requisite preliminary showing in support of the subpoena. DDOL does not dispute that DHS does not already possess the wage reports covered by the subpoena. *See* D.I. 2 at 8; D.I. 24 at 22. Nor does it dispute that DHS complied with the administrative steps required by § 1225(d)(4)(A). *See* D.I. 2 at 8; *see generally* D.I. 24.[4] Thus, I address whether the Government has demonstrated that its

investigation has a legitimate purpose, the subpoena seeks information relevant to such an inquiry, and the subpoena is not unreasonably broad or burdensome.

1.

In a sworn declaration the Government filed in support of the Petition, Special Agent Caraway avers that DHS issued the subpoena to substantiate certain leads about businesses alleged to employ unauthorized aliens. D.I. 2-1 ¶¶ 5–7, 19. Section 274A of the INA, codified as amended at 8 U.S.C. § 1324a(a)(1)(A), makes it "unlawful for a person or other entity to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien." As noted above, § 1103(a)(1) charges DHS with the administration and enforcement of the Act and all other laws relating to the immigration and naturalization of aliens. And together, § 1225(d)(4)(A) and § 287.4 expressly authorize DHS Special Agents in supervisory positions like Special Agent Krauss to issue subpoenas for documents "concerning *any* matter which is material and relevant to the enforcement of [the INA] and the administration of [DHS]." *See* § 1225(d)(4)(A) (emphasis added). The Supreme Court held in *United States v. Minker*, 350 U.S. 179 (1956), that "[this] comprehensive addition of the clause 'or concerning any matter which is material and relevant to the enforcement of [the INA] and the administration of [DHS],' precludes [a] narrow[] reading" of the subpoena power conferred by the provision

8

now codified in § 1225(d)(4)(A).[5]  *See* 350 U.S. at 185–86.  Thus, the subpoena

power authorized by § 1225(d)(4)(A) "encompasses the full range of subjects

covered by the [INA]," *see Minker*, 350 U.S. at 185, and the DHS investigation for

which the subpoena was issued here has a legitimate purpose.

DDOL argues that the subpoena exceeds DHS's authority under

§ 1225(d)(4)(A) because it is an impermissible "John Doe" subpoena issued to "a

third-party record holder for the purpose of identifying targets."  *See* D.I. 24 at 13–

14.  In support of its argument, DDOL cites *Peters v. United States*, 853 F.2d 692

(9th Cir. 1988).  D.I. 24 at 14–16.  The Ninth Circuit held in *Peters* that the

provision now codified in § 1225(d)(4)(A) "does not authorize the [DHS] to issue a

blanket John Doe subpoena where the targets of a general investigation are

unknown."  *See* 853 F.2d at 700.[6]  Assuming without deciding that this holding is

correct, it has no application here because the subpoena is not a John Doe

subpoena.  The targets of DHS's investigation—fifteen Delaware businesses—are

not only known here; they are specifically identified in the subpoena.

2.

The information sought by the subpoena "must be relevant to *some* (any)

inquiry that [DHS] is authorized to undertake."  *See United States v. Oncology

Servs. Corp.*, 60 F.3d 1015, 1020 (3d Cir. 1995) (emphasis in the original).  In

other words, I "must enforce the subpoena unless the information [demanded] is

9

plainly incompetent or irrelevant to *any* lawful purpose of [DHS]." *See id.* (emphasis in the original) (internal quotation marks and citations omitted).

The information DHS seeks by the subpoena—wage reports for the last two quarters of 2024 for fifteen Delaware businesses—is clearly relevant to *an* inquiry that DHS is authorized to undertake, i.e., a worksite enforcement investigation. Special Agent Caraway articulates in paragraphs 9 through 11 of her declaration three compelling reasons why wage reports are relevant to such an inquiry:

> 9.    . . . . First, HSI can input the information from the wage reports into ICE databases to determine whether an employee's social security number has been issued by the Social Security Administration ("SSA"), and if so, whether the social security number is associated with more than one individual. Social Security numbers that have not been issued by the SSA can indicate that an individual may have made up the number and may be unlawfully present and working in the United States. Social Security numbers that are associated with multiple individuals in different locations also can indicate that an individual may be unlawfully present and working in the United States.
>
> 10.    Second, HSI can compare the number of employees the business claims to have had in wage reports to the number of employees seen during surveillance. For example, if law enforcement conducts surveillance on a business and observes 20 employees enter but the wage reports consistently only identify 5 employees, this may be an indicator that some of the employees are being paid "under the table" or in cash and may be unlawfully present and working in the United States. This is also an indicator that the business may have underreported its gross wages, which decreases its overall tax liability and allows for a short-term net profit.

10

11.   Third, the wage reports can help HSI maintain a covert investigation, as well as confirm whether records received from a business are genuine. For example, HSI could subpoena Forms I-9 (Employment Eligibility Verification) and payroll records from a business using subpoenas. However, once a business receives a subpoena, they are made aware that they are under investigation. This may cause a business to fabricate records that they did not, but were required to, maintain; cause a business to temporarily fire undocumented alien employees; and/or cause undocumented alien employees to flee.

D.I. 2-1 ¶¶ 9–11.

DDOL does not appear to dispute that the requested wage reports are relevant to a worksite enforcement investigation. *See* D.I. 24 at 16–19. Instead, it faults the Government for "proffer[ing] no evidence that the businesses whose wage records were subpoenaed are related to the 'tips'" that DHS says prompted its investigation. D.I. 24 at 17. But the information sought by an administrative subpoena need not be "reasonably relevant to the *particular* authorized inquiry." *Oncology Servs.*, 60 F.3d at 1020 (emphasis added). DHS "may seek information on mere suspicion that there is a violation of the law." *See id.* at 1016. "The mere possibility of a new or continued investigation from [DHS's] review of the [wage reports] provide[s] a sufficient basis to seek judicial enforcement of the [DHS] subpoena." *See id.* at 1019; *see also Morton Salt*, 338 U.S. at 642–43 ("[An administrative agency] is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate

11

merely on suspicion that the law is being violated, or even just because it wants assurance that it is not."); *id.* at 652 ("Even if one were to regard the [agency's] request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior [within the scope of their investigative authority] is consistent with the law and the public interest."). In challenging whether the tips DDOL received justify an investigation into the fifteen businesses identified in the subpoena, DDOL in effect asks me to second-guess DHS's decision to initiate that investigation. But "[DHS's] decisions to conduct investigations . . . are committed entirely to [its] discretion," and the Third Circuit "will not countenance judicial interference with [those] decisions." *See Wheeling-Pitt. Steel*, 648 F.2d at 127.[7]

3.

The subpoena requires DDOL to produce thirty documents—two UC-8As for fifteen businesses. The documents are of recent vintage. All thirty of the UC-8As were filed with DDOL less than a year before DHS issued the subpoena. DDOL has more than 400 employees and an operating budget of approximately $90 million.[8] And it does not presently, and could not credibly, argue that it would be unreasonably burdensome for it to search for and copy these thirty records.[9]

12

Instead, DDOL says the subpoena is unreasonably burdensome because the disclosure of the thirty wage reports to DHS will "interfere with the efficient administration of [Delaware's] UC program." D.I. 24 at 26. As DDOL explains it, this "[d]isclosure would likely have a chilling effect on employers voluntarily filing quarterly wage reports and paying their UC tax assessments," and the alleged chilling effect puts at "risk[] the solvency of the [unemployment insurance (UI)] Trust Fund" from which UC payments are made. D.I. 24 at 26 (citing D.I. 14-1 ¶¶ 49, 54–55); *see also* D.I. 24 at 3 ("Compelling disclosure would . . . damage the trust between employers and DDOL[] and pose a significant risk to the solvency of the State Unemployment Insurance Trust Fund.") (citing D.I. 14-1 ¶¶ 51, 53–54); D.I. 24 at 7 ("DDOL[] uses wage reports to calculate employers UI tax liability, which fund Delaware's UI Trust Fund. Without employer UI taxes, the UI system collapses. Thus, the 'method of administration' that 'insures full of payment of unemployment compensation when due' is maintaining the confidentiality of wage reports.").

DDOL's novel theory fails on many fronts. For starters, DDOL does not explain how its production of the thirty wage reports to DHS would ever have been disclosed to the public generally or Delaware employers specifically had DDOL complied with the subpoena. The subpoena expressly requested DDOL "not to disclose the existence of [the] summons for an indefinite period of time" because

13

"[a]ny such disclosure will impede the investigation and thereby interfere with the enforcement of federal law." D.I. 4 at 5. And DDOL does not dispute that historically when DHS served DDOL with a subpoena, DDOL complied with DHS's request not to disclose the existence of the subpoena. *See* 4.1.26 Hr'g Tr. (docketed as D.I. 33) 8:19–9:1, 9:8–15. The only reason the public knows about the subpoena in question and that DHS intends to use the wage reports covered by the subpoena to conduct worksite enforcement investigations is because DDOL refused to comply with the subpoena and forced the Government to file this action.

Second, the UC-8A form itself expressly states that "[i]n accordance with 20 CFR Part 603, wage information and other confidential unemployment insurance information may be requested *and utilized for other governmental purposes*, including, *but not limited to*, verification of an individual's eligibility under other government programs." D.I. 32-1 at 2 (emphasis added); *UC Forms*, *supra* (emphasis added). DDOL's website states the same. *See* Del. Dep't of Lab., *Employer Handbook*, Delaware.gov, https://labor.delaware.gov/divisions/ unemployment-insurance/employer-handbook/ [https://perma.cc/7KGM-B8J5] (last visited Apr. 13, 2026). Thus, Delaware employers have been and continue to be on notice that their wage reports can be used for undefined governmental purposes not related to unemployment compensation. Third, if a Delaware employer decided to read Part 603, it would see, as explained more fully below,

14

that Part 603 expressly permits state agencies like DDOL not only to disclose confidential UC information like that included in wage reports to federal agencies with subpoena power but even to make those disclosures to those agencies "without the actual issuance of a subpoena." *See* § 603.7(b)(2).

Fourth, Delaware employers are required under federal and state law to file wage reports and pay UC taxes. *See* § 1320b-7(a)(3) ("[E]mployers . . . are required . . . to make quarterly wage reports to a State agency . . . ."); 19 Del. C. § 3125 (requiring disclosure); 19 Del. C. § 3345 (requiring payment of UC taxes); 19 Del. Admin. C. § 1202(3.2) ("Employers subject to Part III, Title 19, Delaware Code, shall report contributions due on forms prescribed or approved for this purpose by the Delaware Division of Unemployment Insurance and in accordance with instructions printed thereon (Form UC-8). Such reports shall be accompanied by payment of contributions."). Employers who violate these laws face financial penalties and even potential imprisonment. *See* 19 Del. C. § 3125(c) (subjecting employers who fail to timely file their reports to a penalty of 15 percent of the "total amount of contributions paid or payable"); 19 Del. C. §§ 3302(9)–(10), 3348(o)(4), 3350(b)(6) (subjecting employers who are delinquent in filing reports or paying assessments to a "delinquency assessment rate"); 19 Del. C. § 3382 (subjecting employers who "wilfully fail[] or refuse[] to make any such assessments . . . or to furnish any reports required" to a fine and up to sixty days of

15

imprisonment). Thus, DDOL is asking me to believe that Delaware employers will intentionally violate federal and state laws and risk the penalties associated with such violations in order to prevent the Government from obtaining wage reports with lawful subpoenas to assist in the enforcement of the country's immigration laws. Not surprisingly, other than the conclusory and unsubstantiated averments of Secretary Moultrie, *see* D.I. 24 at 3, 26 (citing D.I. 14-1 ¶¶ 49, 51–55), DDOL cites no evidence to show that a Delaware employer would intentionally engage in this unlawful and risky activity. And I am neither willing nor able to adopt DDOL's cynical view of the State's employers. Federal courts "assume that [employers] will conduct their activities within the law." *See O'Shea v. Littleton*, 414 U.S. 488, 497 (1974); *see also NLRB v. News Syndicate Co.*, 365 U.S. 695, 699 (1961) ("[W]e will not assume that unions and employers will violate the federal law.").

Fifth, and to make matters worse, DDOL is also asking me to believe that so many Delaware employers will violate federal and state law to prevent DHS from obtaining wage reports that the solvency of Delaware's UI trust fund will be put at risk. D.I. 24 at 3. DDOL does not suggest in any way how many employers would violate the law if they knew their wage reports were being obtained by lawful subpoenas to enforce immigration laws; nor does DDOL suggest in any way how many employers would have to refuse to pay their UC taxes to put Delaware's UI trust fund in financial jeopardy. But for DDOL's hyperbolic assertion that its

16

production of wage reports to DHS will jeopardize the solvency of Delaware's UI trust fund to hold true, the vast majority of employers in the State would have to intentionally violate federal and state disclosure and tax laws. That conclusion is necessarily implied by the actuarial measure of solvency—the so-called average high cost multiple or AHCM—that Delaware uses for its UI trust fund. *See* Del. Dep't of Lab., *Delaware Division of Unemployment Insurance Announces New Tax Schedules for 2025*, Delaware.gov (Feb. 3, 2025), https://news.delaware.gov/2025/02/03/delaware-division-of-unemployment-insurance-announces-new-tax-schedules-for-2025/ [https://perma.cc/ZDR7-B396] [hereinafter *DDOL Press Release*]; *see also* 19 Del. C. § 3350C(a) (defining average high cost multiple). An AHCM of 1.0 indicates that the State is expected to be able to pay one year of UC benefits using the money already in the trust fund. *DDOL Press Release*, *supra*. And according to DDOL, the AHCM for Delaware's trust fund as of February 3, 2025 is 0.91. *Id.* That means that if *every* Delaware employer failed to pay UC taxes this year, the fund could still cover 91 percent of the expected UC benefits for the year. *See id.* Thus, DDOL's assertion that enforcement of the subpoena will put at risk the solvency of Delaware's UI trust fund does not pass the straight-face test. The subpoena is not unreasonably burdensome.

17

B.

The Government having made the requisite preliminary showing in support of the subpoena, I must grant the Petition unless DDOL proves that enforcement of the subpoena would undermine the integrity of the judicial process. *See Wheeling-Pitt. Steel*, 648 F.2d at 128. DDOL argues that enforcement of the subpoena would constitute an abuse of the Court's process because an order compelling disclosure of wage reports to DHS would violate regulations codified in 20 C.F.R. Part 603 and Delaware statutes and regulations that implement those federal regulations. D.I. 24 at 3, 24–27; D.I. 14-1 ¶¶ 18–21, 25–26. It also contends that the subpoena was issued for an "improper purpose," described by DDOL as "an intense agenda of immigration enforcement." D.I. 24 at 31–32.

1.

Part 603 was promulgated by the U.S. Department of Labor "to implement the requirements of Federal UC law concerning the confidentiality and disclosure of UC information." § 603.1. It "applies to States and State UC agencies," *id.*, and the parties agree that state law must prevent the disclosure of UC information, including wage reports, "except as provided" in Part 603, *see* § 603.4(b)–(c); D.I. 24 at 23–24; D.I. 31 at 15.

Section 603.5 provides in relevant part:

> Disclosure of confidential UC information is permissible under the exceptions in paragraphs (a) through (g) of this

18

section only if authorized by State law and if such disclosure does not interfere with the efficient administration of the State UC law. Disclosure of confidential UC information is permissible under the exceptions in paragraphs (h) and (i) of this section *without such restrictions*.

(emphasis added). Paragraph (h) of § 603.5, in turn, provides: "Disclosure of confidential UC information in response to a court order or to an official with subpoena authority is permissible as specified in § 603.7(b)." Thus, disclosure of confidential UC information in response to an official subpoena or court order is *not* conditioned on state-law authorization or noninterference with the efficient administration of the state UC system. *See* § 603.5(h). It is instead conditioned on whether § 603.7(b) permits the disclosure. Section 603.7(b)(2) for its part provides that "disclosure is permissible, where . . . [c]onfidential UC information has been subpoenaed, by a local, State or Federal governmental official, other than a clerk of court on behalf of a litigant, with authority to obtain such information by subpoena under State or Federal law." And indeed under § 603.7(b)(2), "[t]he State or State UC agency may choose to disclose such confidential UC information to these officials *without the actual issuance of a subpoena*." (emphasis added).

As discussed above, Special Agent Krauss has the authority under § 1225(d)(4)(A) and § 287.4 to issue subpoenas for documents "concerning *any* matter which is material and relevant to the enforcement of [the INA]." *See* § 1225(d)(4)(A) (emphasis added). DDOL thus may disclose the covered wage

19

reports to DHS under § 603.5(h) and § 603.7(b)(2), regardless of whether DDOL is authorized under state law to do so or whether DDOL believes disclosure would interfere with the efficient administration of the UC system.

DDOL insists that because § 603.5 provides that disclosure of UC information in response to a subpoena is "permissible" as opposed to "mandatory," it is not required under Part 603 to disclose wage reports in response to DHS's subpoena. *See* 4.1 Tr. 40:19–24, 41:8–25. But the relevant question is not whether *Part 603* requires disclosure. The relevant question here is whether *a subpoena lawfully issued pursuant to § 1225(d)(4)(A) and § 287.4* requires disclosure. The answer to that question is clearly yes. And § 603.5(h) makes it equally clear that the confidentiality requirements of Part 603 do not override or impede that subpoena power. These are not close calls.[10]

To the extent DDOL argues that a Delaware statute or regulation prohibits compliance with the subpoena, *see* D.I. 24 at 26–28, the state statute or regulation is preempted by § 1225(d)(4)(A) and § 287.4. "[T]he laws of the United States . . . shall be the supreme law of the land." U.S. Const. art. VI, cl. 2. "Where a state statute conflicts with, or frustrates, federal law, the former must give way." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993); *see also Rose v. Ark. State Police*, 479 U.S. 1, 3 (1986) (per curiam) ("There can be no dispute that the Supremacy Clause invalidates all state laws that conflict or interfere with an Act of

20

Congress."); *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 395 (1971) ("[S]tate law may [not] undertake to limit the extent to which federal authority can be exercised."). A conflict exists where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). For that reason, federal courts have repeatedly found state statutes and constitutional provisions to be preempted when they prevent compliance with a federal administrative subpoena. *See, e.g., Presley v. United States*, 895 F.3d 1284, 1292 (11th Cir. 2018) (holding that "the privacy right in Florida's Constitution must yield" because it "would substantially impede the IRS's ability to summon bank records pursuant to the Internal Revenue Code"); *Or. Prescription Drug Monitoring Program v. DEA*, 860 F.3d 1228, 1236 (9th Cir. 2017) (holding that the Controlled Substances Act (CSA) preempts an Oregon statute that "plac[ed] the initial burden of requiring a court order to enforce the subpoena upon the DEA" because the state statute "interferes with the scheme Congress put in place for the federal investigation of drug crimes and thereby undermines Congress's goal of strengthen[ing] law enforcement tools against the traffic in illicit drugs") (latter alteration in the original) (internal quotation marks and citation omitted); *United States v. Zadeh*, 820 F.3d 746, 750–52 (5th Cir. 2016) (holding that the CSA preempts the Texas Occupations Code insofar as the latter prohibits the respondent from complying with a DEA subpoena); *United*

21

*States ex rel. Off. of Inspector Gen. v. Phila. Hous. Auth.*, 2011 WL 382765, at *5 (E.D. Pa. Feb. 4, 2011) (holding that the Inspector General Act preempts two Pennsylvania statutes insofar as they prevent disclosure of the subpoenaed information); *St. Luke's Reg'l Med. Ctr., Inc. v. United States*, 717 F. Supp. 665, 666 (N.D. Iowa 1989) (holding that an Iowa law was preempted insofar as it prohibited compliance with an administrative subpoena issued by the Department of Health and Human Services).

Here, Congress granted immigration officers broad power to "require by subpoena" testimony or the production of documents "concerning any matter which is material and relevant to the enforcement of [the INA] and the administration of [DHS]." *See* § 1225(d)(4)(A). Thus, to the extent DDOL argues that Delaware law prevents it from complying with DHS's subpoena, *see* D.I. 24 at 24, 26–28, that law is preempted.

2.

All that remains is DDOL's complaint that DHS is "pursu[ing] an intense agenda of immigration enforcement." *See* D.I. 24 at 32. This is a political argument; not a legal one. And this Court is not the proper "forum in which to air [DDOL's] generalized grievances about the conduct of government." *See Flast v. Cohen*, 392 U.S. 83, 106 (1968). It would be wholly inappropriate for me to consider this line of argument, and I decline to do so.

22

III.

For the reasons discussed above, the April 7 subpoena is valid and enforceable.  I will therefore grant the Government's Petition.

The Court will issue an Order consistent with this Memorandum Opinion.

---

[1] All references to the INA or the Act are to the Act as amended.

[2] Section 1225(d)(4)(A) literally refers to "the administration of the Service," not "the administration of DHS."  The Act defines "Service" as "the Immigration and Naturalization Service of the Department of Justice."  8 U.S.C. § 1101(a)(34).  The Act defines "immigration officer" as "any employee or class of employees of the Service or of the United States designated by the Attorney General, individually or by regulation, to perform the functions of an immigration officer specified by [the Act] or any section of [Title 8]."  8 U.S.C. § 1101(a)(18).  In 2002, as part of a major government reorganization following the terrorist attacks of September 11, 2001, Congress created the DHS and transferred the powers and personnel of the Immigration and Naturalization Service of the Department of Justice (the INS) to three components of DHS, one of which is ICE.  *See* Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135 (codified as amended in relevant part at 6 U.S.C. §§ 111, 202, 211, 251–52, 271, 291).  I have updated references to the "Service" accordingly.

[3] The statute provides:

> Any United States district court within the jurisdiction of which investigations or inquiries are being conducted by an immigration officer may, in the event of neglect or refusal to respond to a subpoena issued under this paragraph or refusal to testify before an immigration officer, issue an order requiring such persons to appear before an immigration officer, produce books, papers, and documents if demanded, and testify, and any failure to obey such order of the court may be punished by the court as a contempt thereof.

§ 1225(d)(4)(B).

23

[4] In a one-sentence footnote in the Background section of its brief filed in opposition to the Petition, DDOL states that Box 2 of the subpoena "was left blank," and that Box 2 "requires DHS to indicate what [the] subpoena [was] specifically issued 'in reference to' and to include a 'Title of Proceeding' or 'File Number, if Applicable.'" D.I. 24 at 11 n.37. To the extent DDOL intended by this sentence to argue that DHS failed to show that it took the administrative steps required in support of the subpoena, it has forfeited the argument. *See Higgins v. Bayada Home Health Care Inc.*, 62 F.4th 755, 763 (3d Cir. 2023) ("[T]he District Court was not required to consider [the plaintiff's argument] because 'arguments raised in passing (such as, in a footnote), but not squarely argued, are considered [forfeited].'") (last alteration in the original) (quoting *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997)); *see also id.* ("A passing reference to an issue . . . will not suffice to bring that issue before this court.") (omission in the original) (citation omitted).

[5] In 1956, when *Minker* was decided, what is now § 1225(d) was § 1225(a). *See* 350 U.S. at 180–81 (quoting the statutory provision at issue).

[6] In *Peters*, too, what is now § 1225(d) was § 1225(a). *See* 853 F.2d at 695 (quoting the statutory provision at issue).

[7] In a supplemental declaration filed with the Government's reply brief, Special Agent Caraway avers: "Each of the businesses named in the subpoenas was the subject of at least one individual tip received by HSI. Some businesses would have been connected with more than one tip." *See* D.I. 31-1 ¶ 14. I did not consider this averment because Special Agent Caraway made it for the first time in support of the reply brief. *See D'Argenzio v. Bank of Am. Corp.*, 877 F. Supp. 2d 202, 208 (D.N.J. 2012) ("Courts have held that a moving party may not . . . present new factual materials in a reply brief that it should have raised in its initial brief.") (internal quotation marks and citation omitted); *Spudis v. Metro Mattress Corp.*, 2026 WL 526706, at *4 n.2 (M.D. Pa. Feb. 25, 2026) ("Courts . . . may decline to consider exhibits attached, for the first time, to a reply brief.") (citations omitted).

[8] Del. Off. of Mgmt. & Budget, Fiscal Year 2026 Budget: Labor, https://budget.delaware.gov/budget/fy2026/documents/operating/labor.pdf [https://perma.cc/4UJL-UC65] (last visited Apr. 9, 2026); Del. Dep't of Hum. Res., State of Delaware Executive Branch Workforce: EEO Representation Summary Fiscal Year 2024 (2024), https://dhr.delaware.gov/people-culture/documents/eeo-aa-report-action-plan-2024-2025.pdf [https://perma.cc/VHS6-GGQE].

24

[9] In its brief filed in opposition to the Petition, DDOL faulted DHS for not providing it with Federal Employer Identification Numbers (FEINs) for fourteen of the fifteen businesses. D.I. 24 at 19–20. It stated in its brief that DHS's failure to provide FEINs for each of the fifteen businesses rendered the subpoena "indefinite" and "unreasonable," D.I. 24 at 20–21, and it intimated that this failure makes it unduly burdensome for DDOL to locate many of the thirty documents covered by the subpoena, *see* D.I. 24 at 20 (stating that "[f]or some of the businesses listed[] [in the subpoena] there were multiple possible businesses whose records could possibly have been the subject of DHS's request," and that, therefore, without FEINs, DDOL is unable to "confirm or verify [the identity of] many of the businesses").

DDOL, however, admits that it was able to confirm the identity of and locate the wage reports for two of the fifteen businesses listed in the subpoena without having FEINs for those businesses. *See* D.I. 18-1 ¶ 12. And it does not dispute the Government's assertion that historically (i.e., before the April 7 subpoena) when DDOL received subpoenas from DHS, it had worked cooperatively with DHS agents, including Special Agent Caraway, to confirm the identities of businesses and locate the wage reports for those businesses without resort to FEINs. *See* 4.1.26 Hr'g Tr. (docketed as D.I. 33) 8:19–9:1, 9:18–24, 20:7–9, 54:3–8; D.I. 24 at 29; D.I. 31 at 9. When I asked DDOL's counsel at oral argument if DDOL would comply with the subpoena if DHS provided it with FEINs for all the businesses listed in the subpoena, counsel stated, "At this point, Your Honor, no." 4.1 Tr. 26:17–21.

Accordingly, I do not understand DDOL to be currently taking the position that it would be unduly burdensome for it to locate and copy the records covered by the subpoena. In the event DDOL intended to maintain that position, I would reject it as not credible given DDOL's resources, the limited number of documents covered by the subpoena, DHS's willingness to work with DDOL to confirm the identity of the businesses covered by the subpoena, the fact that DDOL was able to identify two of the businesses without FEINs and without help from Agent Caraway, and the historical track record of DDOL working cooperatively with DHS agents to confirm the identity of the businesses listed in prior subpoenas for wage reports. I would also reject it because of DDOL's decision to ignore and not offer to work with DHS or the U.S. Attorney's Office to reach an accommodation with respect to the April 7 subpoena. *See* 4.1 Tr. 4:16–20, 9:22–24; *see also Morton Salt*, 338 U.S. at 653 ("Before the courts will hold [a subpoena] seeking information . . . to be arbitrarily excessive, they may expect the [respondent] to have made reasonable efforts before the [agency] itself to obtain reasonable conditions."); *In re Subpoena*

25

*Duces Tecum*, 228 F.3d 341, 351 (4th Cir. 2000) ("[A]s a condition to maintaining the argument that an investigative subpoena is overly broad and oppressive, [the respondent] would have to be able to point to reasonable efforts on his behalf to reach accommodation with the government.").

[10] Section 603.5(e) provides that "[d]isclosure of confidential UC information to a public official for use in the performance of his or her official duties is permissible." During the period for public commentary on Part 603, some commenters questioned the need for § 603.5(h) "given that § 603.5(e) permits disclosure to public officials." Federal-State Unemployment Compensation Program (UC); Confidentiality and Disclosure of State UC Information, 71 Fed. Reg. 56830, 56839 (Sept. 27, 2006) (codified at 20 C.F.R. pt. 603). In response, the Department of Labor stated:

> [D]isclosures under § 603.5(e) must be made under the agreements described in § 603.10, which require, among other things, the payment of costs and the safeguarding of information, before any information may be disclosed. Thus, that provision is limited to cases where disclosure is explicitly authorized or required under the State UC law. The subpoena exception, however, pertains to situations where governmental officials have the authority to demand information under *their* laws, but where State UC law may not permit such disclosure or where an agreement may not have been entered into, thus necessitating the public official to obtain the confidential UC information through a subpoena. Therefore, no change is made in the final rule.

*Id.* (emphasis in the original).

26