## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>*Petitioner,*<br><br>v.<br><br>THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, et al.,<br><br>*Respondents.* | CIVIL ACTION<br>NO. 25-6502 |

**Pappert, J.**                                                      **April 27, 2026**

### MEMORANDUM

In the wake of Hamas's October 2023 terrorist attack on Israel, the University of Pennsylvania's then-President Elizabeth Magill and others affiliated with the school stated publicly numerous times that Jewish faculty, employees and others at Penn had been subject to vile acts of antisemitism and harassment on campus. Prompted by these statements, United States Equal Employment Opportunity Commissioner Andrea Lucas issued a sworn charge of discrimination, alleging Penn engaged in a pattern or practice of discrimination in violation of Title VII of the Civil Rights Act of 1964. Specifically, the charge alleged Penn subjected Jewish employees to a hostile work environment based on religion.

The EEOC subsequently issued an administrative subpoena, with which Penn refused to comply, seeking contact information for Penn employees who may have been victims of, or witnesses to, such harassment. The EEOC sought judicial enforcement of the subpoena and the Court permitted five groups to intervene. Penn, along with the intervenors, opposed the EEOC's request. The Court granted the EEOC's application,

1

requiring Penn to comply with most of the subpoena by May 1.  Penn, and later the intervenors, moved to stay the Court's order pending appeal.  The Court grants Penn's motion and denies the intervenors' as moot.

Penn does not have a strong chance of prevailing on appeal but makes, narrowly, a showing of irreparable harm.  Staying the Court's order will not substantially injure the EEOC and a stay will allow the Third Circuit Court of Appeals to address in an orderly manner a matter of great public interest.

I

A request for a stay pending appeal prompts four questions: (1) whether the applicant has made a strong showing it is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether a stay will substantially injure the other party in the litigation; and (4) whether the public interest favors a stay.  *Nken v. Holder*, 556 U.S. 418, 426 (2009).  When the Government is the party opposing the stay, the last two factors merge.  *Id.* at 435.  The Court must balance all four factors and consider their relative strength.  *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015).

If a moving party does not have a strong chance of success on the merits, a stay may be appropriate if the other factors tip in its favor.  *Id.* at 570–71.  In measuring the relative strength of the stay factors, the Court is mindful that in high-profile administrative subpoena enforcement actions involving questions of constitutional law, stays have been issued to give the Third Circuit Court of Appeals time for careful consideration and deliberation on the merits.  *See United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 573 (3d Cir. 1980) (stating in administrative subpoena

2

enforcement action involving substantive due process district court order enforcing the subpoena "was stayed pending disposition of the appeal"); *EEOC v. Franklin & Marshall Coll.*, 775 F.2d 110, 113 (3d Cir. 1985) (stating in administrative subpoena enforcement action involving First Amendment the district court "stay[ed] enforcement of its order compelling compliance with the subpoena pending disposition of the appeal"); *EEOC v. University of Pa.*, 850 F.2d 969, 974 n.2 (3d Cir. 1988) (stating in administrative subpoena enforcement action involving First Amendment the Third Circuit Court of Appeals stayed the district court's order enforcing the subpoena pending appeal); *see also FDIC v. Wentz*, 55 F.3d 905, 907 (3d Cir. 1995) (stating in administrative subpoena enforcement action involving substantive due process the district court stayed its order enforcing the subpoena pending appeal).

1

Penn does not have a strong chance of success on the merits, *In re Revel AC, Inc.*, 802 F.3d at 571, and its motion further exposes its vulnerabilities on appeal. The charge of discrimination is valid, the EEOC's subpoena seeks information relevant to the charge and the subpoena does not unduly burden Penn. The subpoena also does not violate substantive due process or the First Amendment. The Court explained its reasoning in its memorandum opinion, *see generally* (Mem. Op., Dkt. No. 54), and Penn either ignores that reasoning, mischaracterizes it, or objects to it on superficial and conclusory grounds.[1]

---

[1] The intervenors' motion for a stay suffers from similar flaws. For example, they argue the subpoena triggers exacting scrutiny under the First Amendment because it burdens the affected employees' ability to associate. (Intervenors' Mem. of L. in Supp. of Mot. at 5–6, Dkt. No. 61-1.) But the Court applied exacting scrutiny. The intervenors also contend their other constitutional and statutory claims present "substantial" issues. (*Id.* at 6.) But the purported substantiality of a question does not automatically translate to success on the merits.

a

Penn argues initially that the Third Circuit Court of Appeals will review the Court's decision *de novo* and many of the questions presented in this case "are matters of first impression." (Penn's Mem. of L. in Supp. of Mot. at 6–7, Dkt. No. 57-1.) But a *de novo* standard of review and matters of first impression do not automatically translate to success on the merits.

Penn also contends the EEOC's subpoena is "so novel" it cannot be enforced. (*Id.* at 8.) Penn stresses "the EEOC has cited no authority in which a court enforced a subpoena conscripting an employer to identify employees of a specific religion." (*Id.*) But the EEOC requested this information to further a charge of discrimination based on religion because in 2023 President Magill made numerous public statements over a one-month period describing the pernicious acts of antisemitism Jewish individuals, including faculty and other employees, experienced on Penn's campus. (Mem. Op. at 4–5.) While the EEOC's investigation of a major university for alleged systemic religious discrimination may be comparatively unique, the purpose of its subpoena is not. The subpoena seeks contact information for employees affiliated with the Penn Jewish community because, in the EEOC's view and to tailor its requests as narrowly as possible, those employees are more likely to possess information relevant to whether Penn subjected Jewish employees to a hostile work environment based on religion.

Most importantly, Penn has no support for its proposition that a court may quash an administrative subpoena because it contains a "novel" request. Penn wants the Court to sanction a newfangled principle—that an EEOC subpoena is invalid if it does not "resembl[e]" other judicially enforced EEOC subpoenas. (Penn's Mem. of L. in

Supp. of Mot. at 7.)  At bottom, Penn appears to believe that a different set of legal standards should govern the enforceability of EEOC subpoenas in discrimination cases involving religion generally, and antisemitism specifically.  But Penn neither articulates what those standards are, nor cites any precedent pursuant to which courts can fabricate them.  Penn wants to dictate the terms of the EEOC's investigation, continuing to argue it can contact its employees on the EEOC's behalf.  But that gives an employer subject to a federal investigation an unacceptable role in, or authority over, how that investigation is conducted.  (Mem. Op. at 28–29.)

b

Penn's purported objections to the Court's reasoning are wanting.  It first contends the charge of discrimination fails to state a method of discrimination because it is "blank" and "merely asserts a legal conclusion."  (Penn's Mem. of L. in Supp. of Mot. at 7.)  But again, the charge fairly alleges Penn failed to provide Jewish faculty, staff and other employees a work environment free from religious harassment in the form of antisemitic slurs, messages and threats of violence, pointing Penn to specific acts of antisemitic harassment employees may have experienced on campus.  (Mem. Op. at 10–11.)  That suffices to allege a method of discrimination under *EEOC v. Shell Oil Company*, 466 U.S. 54 (1984).  (Mem. Op. at 7–14.)  Penn mischaracterizes the Court's opinion as concluding that a commissioner can state a valid method of discrimination by merely alleging an employer has violated Title VII.  (Penn's Reply in Supp. of Mot. at 8, Dkt. No. 65.)  As Penn knows, that is not what the Court held, and Penn fails to advance a single critique of its actual reasoning.  Requiring a commissioner to allege more than what Commissioner Lucas alleged here would "oblige the Commissioner to

5

substantiate [her] allegations *before* the EEOC initiates an investigation, the purpose of which is to determine whether there is reason to believe those allegations are true." *Shell Oil Co.*, 466 U.S. at 71. At oral argument, Penn said the charge could have alleged Penn required employees "on their way to work to run a[n] [antisemitic] gauntlet." (Tr. of Oral Arg. at 43:24–25.) The charge pretty much says just that. Based on President Magill's statements describing specific acts of antisemitic harassment Jewish faculty and employees experienced on campus, the charge alleges Penn permitted Jewish faculty, staff and other employees to endure religious harassment in the form of antisemitic slurs, messages and threats of violence. (Mem. Op. at 10–14.)

Penn also argues the subpoena violates its employees' right to informational privacy. Specifically, it contends the Court did not "squarely" address whether mere affiliation with a Jewish-related organization on campus falls within the ambit of materials protected by substantive due process. (Penn's Mem. of L. in Supp. of Mot. at 8.) But as the Court explained, Penn offered nothing to support this argument. (Mem. Op. at 18–19.) Information is private if it is generally unavailable and a person treats it as confidential. *Fraternal Ord. of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105, 116 (3d Cir. 1987). Penn presented no facts that could show its employees' affiliation with Jewish-related organizations is generally unavailable and that the employees keep this information confidential. Nor did Penn contend that affiliation with a Jewish-related organization on campus is inherently private information, such as a person's medical records. Adjudication of substantive due process rights relies on facts and legal arguments, not conclusory and generalized assertions of privacy.

More importantly, the Court's substantive-due-process holding did not turn on whether the affected employees have a privacy interest in the information sought by the subpoena. The Court assumed the EEOC's subpoena sought private information and then balanced the EEOC's interest in collecting it against the employees' interest in keeping it from the EEOC. (Mem. Op. at 21–23.) In so doing, the Court applied the privacy factors from *United States v. Westinghouse Electric Corp.* (*Id.*) As the Court explained, the EEOC has a substantial interest in investigating a valid charge of discrimination. (*Id.* at 21.) It has a reasonable need for the information at issue because it seeks to contact Penn employees likely to possess evidence relevant to whether Penn subjected Jewish employees to a hostile work environment based on religion. (*Id.*) Nothing suggests EEOC personnel will use the information to harm the affected employees. (*Id.*) And Title VII protects against unauthorized disclosure of the information. (*Id.* at 21–23.)

Penn does not take on the Court's reasoning or explain how the Court erred in applying *Westinghouse*'s privacy factors. It just asserts the EEOC cannot "muster any rebuttal on those factors," whatever that means. (Penn's Reply in Supp. of Mot. at 10.) Another reason Penn is unlikely to win on its informational privacy claim is that such claims rarely, if ever, succeed. Each time it has spoken on the subject of informational privacy, the Supreme Court has permitted disclosure upon balancing the interests at stake. *See Whalen v. Roe*, 429 U.S. 589, 603–04 (1977) (upholding a state system that records personal information of patients who obtain prescription drugs); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 465 (1977) (requiring President Nixon to disclose information); *NASA v. Nelson*, 562 U.S. 134, 148 (2011) (requiring federal contract

employees to disclose information to the government). And the Third Circuit Court of Appeals has taken a similar approach. *E.g.*, *Westinghouse Elec. Corp.*, 638 F.2d at 580 (holding an employer was not justified in a blanket refusal to turn over employee medical records to the government); *Fraternal Ord. of Police, Lodge No. 5*, 812 F.2d at 112–17 (requiring police officers to disclose private information to government).

Finally, Penn argues the subpoena infringes the affected employees' right to associate with Jewish-related organizations on campus. The Court viewed the subpoena through the lens of exacting scrutiny, as Penn wanted it to do. (Mem. Op. at 24–29.) Under that standard, there must be a substantial relation between the subpoena and an important governmental interest, and the governmental interest must reflect the seriousness of the actual burden imposed on the affected employees. *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383, 2385 (2021). The subpoena must also be narrowly tailored. *Id.* at 2384.

As the Court explained, the EEOC has an important interest in investigating a valid charge of discrimination. (Mem. Op. at 25.) Next, there is no dramatic mismatch between that interest and the subpoena the EEOC issued. (*Id.*) The subpoena seeks contact information for employees in Jewish-related organizations because they are reasonably likely to have information relevant to the charge. (*Id.* at 25–26.) And the EEOC's interest in enforcement of the subpoena reflects the actual burden imposed on the affected employees. (*Id.* at 26–28.) The subpoena does not require Penn to disclose an employee's specific affiliation with a particular organization. (*Id.*) Nor does it require Penn to publicize any information. (*Id.*) And the record contains no evidence

8

showing enforcement of the subpoena would actually chill the affected employees'
ability to associate with Jewish-related organizations on campus. (*Id.*)

Finally, the subpoena is narrowly tailored. Narrow tailoring requires the EEOC
to demonstrate its need for the information in light of less intrusive alternatives. (*Id.*
at 28.) But an alternative must be adequate. (*Id.*) And an alternative may be
inadequate if it is ineffective. (*Id.*) The claimant "bears the burden to provide, in the
record, evidence of . . . feasible alternatives" and the "government can then rebut by
demonstrating that [the] alternative measures . . . would fail to achieve its interests."
*Fla. Preborn Rescue, Inc. v. City of Clearwater*, 161 F.4th 732, 744 (11th Cir. 2025)
(citations omitted and modified); *see also Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 666
(2004) (explaining the government must show "that respondents' proposed less
restrictive alternatives are less effective"); *Ams. for Prosperity Found.*, 141 S. Ct. at
2385 (explaining in a previous compelled disclosure case the Supreme Court held the
"various narrower alternatives proposed by the plaintiffs were inadequate").

Penn did not point to *any* alternative, arguing only "the EEOC's sweeping
inquiry into all employee associations with Jewish-related organizations is not
'narrowly tailored to the' agency's asserted interest in hearing about employee
experiences with antisemitism." (Penn's Answer to EEOC's Appl. for Enforcement at
26, Dkt. No. 20.) The intervenors pointed to two alternatives, arguing Penn could
inform its employees of the EEOC's investigation and the EEOC could invite Penn
employees to contact it through a hotline. (Intervenors' Answer to EEOC's Appl. for
Enforcement at 18–19, Dkt. No. 21.) The Court addressed both of the intervenors'
alternatives in its opinion, finding them inadequate. (Mem. Op. at 28–29.) The first

proposal forces the EEOC to speak through Penn, which discourages employees to report discrimination. (*Id.*) And both proposals prohibit the EEOC from contacting potential victims or witnesses of harassment directly to inform them of their rights and learn if they have evidence of discrimination. (*Id.*)

Since the Court's ruling, Penn has come up with its own alternative. It now argues a third-party vendor may inform its employees of the EEOC's investigation. (Penn's Mem. of L. in Supp. of Mot. at 10.) But this suffers from the same flaws as the intervenors' alternatives. (Mem. Op. at 28–29.) It strips the EEOC of its ability to contact possible victims or witnesses of antisemitic harassment, inform them of their rights, learn if they have evidence of discrimination, and attempt to persuade them to come forward if they do. (*Id.*) Penn also suggests the EEOC can contact every one of its over twenty thousand employees, (Penn's Mem. of L. in Supp. of Mot. at 10), but as Penn already knows, this too is inadequate. The EEOC has limited resources, (Mem. Op. at 5), so forcing it to contact twenty thousand individuals would significantly undermine its ability to conduct an effective investigation, not to mention that if it tried to do so, Penn would complain that the investigation was overly broad. Moreover, narrow tailoring in this context requires only a "reasonable fit" between the EEOC's goal and the means chosen to accomplish that goal. *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989). If the EEOC's subpoena is "in proportion to the interest served," the Court must "leave it to [EEOC] decisionmakers to judge what [requests] [] may be best employed." *Id.* (citation omitted). There is a clear fit between the EEOC's subpoena and its interest. The subpoena seeks contact information for Penn employees aligned with the Penn Jewish community because they are reasonably likely to possess

10

information relevant to whether Penn subjected Jewish employees to a hostile work environment based on religion.

2

The irreparable-harm factor in this high-profile administrative subpoena enforcement action tilts in Penn's favor, albeit barely. Irreparable harm is "harm that cannot be prevented or fully rectified by a successful appeal." *In re Revel AC, Inc.*, 802 F.3d at 568 (citation omitted). Penn asserts a successful appeal would not prevent or fully rectify its disclosure of the affected employees' information to the EEOC. The EEOC responds that if respondents prevail on appeal, the Third Circuit Court of Appeals can order the EEOC to destroy the information Penn turned over. But that would not prevent or fully rectify the initial disclosure of the information to the EEOC.

3

The EEOC fails to show that it would be substantially injured by a stay pending appeal. Substantial injury requires real, not speculative, harm. *Id.* at 572. The EEOC argues a stay would interfere with its ability to investigate Penn, emphasizing "memories fade, witnesses and victims [may] leave [Penn], and potential harassing behavior [may] persist[]." (EEOC's Resp. in Opp'n at 15, Dkt. No. 62.) But about five months after Commissioner Lucas issued the charge in December of 2023, the EEOC went dark for nearly one year. (Tr. of Oral Arg. at 19–20.) Though the EEOC represented this sort of investigatory delay is not "unusual," (*Id.* at 20:16), it undermines its asserted injury. The EEOC's articulated harms—memories fade, witnesses and victims may leave Penn and potential harassment may persist—are also

11

"speculative." *In re Revel AC, Inc.*, 802 F.3d at 572. Nothing in the record supports these harms would come to fruition. *Id.*

4

The public interest favors a stay. This factor "balances the benefits and harms to the public," considering the "consequences beyond the immediate parties." *Id.* at 569, 572 (citation omitted). The EEOC asserts the public has an interest in the EEOC investigating a valid charge of discrimination, and that is true, but the public also has an interest in the orderly resolution of this case through the ordinary appellate process. The EEOC's investigation and the Court's decision, driven largely by how Penn and the intervenors have mischaracterized both, have sparked a great deal of public debate. The Third Circuit Court of Appeals should have time to consider and decide the merits of this case, absent unnecessary procedural deadlines.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*

Gerald J. Pappert, J.